**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**Walter H. KUPAU,
Defendant-Appellant.**

No. 84–1034.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Dec. 10, 1984.

Decided Jan. 28, 1986.

As Amended March 25, 1986.

Mark J. Bennett, Asst. U.S. Atty., Honolulu, Hawaii, for plaintiff-appellee.

Addison M. Bowman, Pyun, Okimoto, & Fukumoto, Honolulu, Hawaii, for defendant-appellant.

Before WALLACE, HUG, and SCHROEDER, Circuit Judges.

HUG, Circuit Judge:

Walter H. Kupau appeals his convictions for three counts of perjury under 18 U.S.C. § 1621 (1982) and three counts of false declaration under 18 U.S.C. § 1623 (1982). Kupau maintains that he was denied a fair trial because the district court (1) allowed an FBI agent to play tapes for the jury with no one present to record communication between the jury and the agent, (2) communicated *ex parte* with the jury, (3) contaminated the jury by giving it a dictionary, (4) refused to allow Kupau to introduce the expert testimony of a linguist, and (5) committed error in excluding portions of the defense's proffered testimony of a labor law attorney. We disagree with Kupau's contentions and affirm his convictions.

## BACKGROUND

On January 6, 1981, Local 745, United Brotherhood of Carpenters and Joiners of America, AFL–CIO began picketing C & W Construction Co. ("C & W"), a nonunion firm. The chief executive officer of C & W was Walter Mungovan. Defendant Kupau, who was the statewide head of the union, characterized the purpose of the picketing as informational, *i.e.*, intended to alert the public that C & W paid below union scale wages. Mungovan filed a complaint with the National Labor Relations Board ("NLRB") alleging that the purpose was not informational but organizational. Informational picketing may continue indefinitely but organizational picketing must culminate in a request for election pertaining to union representation by the targeted work force at least within thirty days from the commencement of the picketing. The NLRB agreed with Mungovan and sought to enjoin the picketing in federal district court.

Kupau opposed the NLRB action and submitted to the court affidavits that the picketing was solely informational. Kupau also testified at the perjury trials of other union officials that the picketing was not organizational. These characterizations conflicted with conversations—covertly taped by Mungovan—between Mungovan and Kupau, and between Mungovan and various Kupau subordinates. Counts one through three were based on the affidavits. The remaining four counts alleging false declarations resulted from Kupau's testimony at the trials of the other union officials. The jury convicted Kupau of six of the seven counts.

## ANALYSIS

### A. *FBI Agent's Presence*

As noted above, certain taped conversations were important evidence in the case against the defendant. The jury desired to hear these conversations again during its deliberations and requested that the court provide someone capable of running the

tape player. At a hearing outside the jury's presence, the court decided to allow FBI Agent Hilton Lui to play the tapes for the jury. Lui had played no role in the trial, but apparently had sat at the Government's table during a portion of the trial. Counsel for the defense objected to Lui for this reason.

The jury returned to the courtroom after the hearing and was informed by the court that Lui would act as the tape machine technician. The court instructed the jury that Lui "will be here only for the purpose of playing the Nishibayashi tape and the Torres tape. That's just so that by accident somebody doesn't erase the tape and, you know, be in trouble. But, he cannot answer any questions, so don't even talk to him. He'll just be here like a nonentity. And he can't comment as to any evidence...." The district judge also announced that he would clear the courtroom of all but the jury and Lui for the playing of the tapes, which he did. The judge also requested that Lui run the tapes for the jury on a second occasion.

■ On appeal the defense argues that it violated the sixth amendment for the court to allow "an FBI agent and the jurors to be alone together without a record of what was said." This argument is new. The defense did not object because the agent and the jury were to be alone in the courtroom during the tape playing. Nor did the defense object because Lui was an FBI agent. The sole reason given the judge to consider in ruling on the objection to Lui was that Lui had sat at the Government's table during the trial, a point not pressed on appeal.

The ground cited on appeal was not raised during the hearing, prior to sentencing when counsel were given further opportunity to "make a record" for appeal, or as part of the motion for a new trial. Where the district court has been denied the opportunity to consider an issue, the appellate courts will not entertain it absent manifest injustice. *Professional Seminar Consultants v. Sino Am. Tech.*, 727 F.2d 1470, 1472 (9th Cir.1984).

There was no objection made to playing the tapes, which the jury quite understandably wished to hear again. There was a problem in providing someone able to operate the equipment and to ensure that the tape would not be erased or otherwise damaged. The judge solved this practical problem by permitting Lui to operate the tape machine but with cautionary instructions. There was no request that the judge or a reporter or counsel remain while the tape was being played to ensure that there was no communication with the jury.

After a case has been submitted to a jury, there are serious concerns about any outside contact with the jury. Special care is taken by the bailiffs and marshals during meals or when attending to the personal needs of the members of the jury to ensure that the jury deliberation is free from outside influence. Here there was a risk that someone associated with the prosecution, while alone with the jury after submission, could, in some fashion, influence its deliberations. In hindsight it would have been better to have run the machine in open court with the reporter, the judge, counsel, and the defendant present. The defense made no objection to the clearing of the courtroom of all but the jury and Lui.

If the jury and Lui followed the instructions of the judge that Lui operate the machine solely as a mechanic and be treated as a non-entity, there was no improper influence on the jury. There is no indication that the instructions were not followed. There is only the potential danger of outside influence on the jury deliberations and the lack of the presence of the judge, counsel, or a reporter to verify that nothing untoward did occur.

With appropriate cautionary instructions having been given and no indication that they were not followed, and with no request having been made for a reporter, the judge, the defendant, or counsel to remain in the courtroom, we find that the procedure followed does not require reversal.

■ It is apparent that the district court viewed the tape playing as merely mechanical assistance to enable the jury to hear the evidence as a part of the jury's deliberation and not as "a stage of the trial" under Fed.R.Crim.P. 43, at which the presence of the defendant was required. However, the procedure is more properly viewed as a stage of the trial at which the presence of the defendant is required. It differs from the kind of technical assistance rendered by the marshals in dealing with the physical needs of the jury, because it involves the crucial jury function of reviewing the evidence. The defendant did not raise this objection in the district court but has raised it on appeal. We will therefore consider the matter under the plain error standard. We recognize that the defendant had a right to be present when the tape was being played, and this was a right which could not be waived by counsel. *Bustamante v. Eyman*, 456 F.2d 269, 274 (9th Cir.1972). It was error to permit the playing of the tape without defendant's personal waiver of his right to be present, and it was also error to permit the replay without a reporter present to make a record. Similar errors were, however, held harmless beyond a reasonable doubt in *Bustamante v. Cardwell*, 497 F.2d 556 (9th Cir.1974). In this case, given the court's emphatic cautionary instructions, the obvious efforts of the court, by clearing the courtroom, to prevent any outside influences, and the absence of any suggestion that extraneous matters came before the jury, we similarly hold that the error was harmless beyond a reasonable doubt.

## B. *Judge-Jury Ex Parte Communication*

During the deliberations the jury sent a series of notes to the court. These ranged in nature from innocuous requests for bus fare, gas money, or early adjournment of the day's deliberations to queries concerning the identities of various witnesses and other substantive matters.[1] The court informed both Government and defense counsel of each substantive request and obtained their suggested responses. When the court had prepared a response, counsel were informed of its decision and their views were again solicited, before the court finally submitted the response to the jury.

■ Rule 43 of the Federal Rules of Criminal Procedure provides that "the defendant shall be present ... at every stage of the trial including the impaneling of the jury and the return of the verdict...." That right is not absolute, however, and even involuntary absence may be harmless error. *United States v. Ford*, 632 F.2d 1354, 1378 (9th Cir.1980). The absence of the defendant during a portion of the trial proceedings is harmless error if there is no reasonable possibility that prejudice resulted from the absence. *United States v. Birges*, 723 F.2d 666, 670 (9th Cir.), *cert. denied*, 466 U.S. 943, 104 S.Ct. 1926, 80 L.Ed.2d 472 (1984); *cf. United States v. Ford*, 632 F.2d 1354, 1378–79 (9th Cir. 1980); *cf. United States v. Cassasa*, 588 F.2d 282, 285 (9th Cir.1978). If the absence of the defendant constituted a constitutional violation, such as a sixth amendment confrontation violation, or was of such significance as to constitute a fifth amendment due process violation, then the Government would be required to prove that the error was harmless beyond a reasonable doubt. *United States v. Gagnon*, 721 F.2d 672, 678 (9th Cir.1983).

In this case, the judge's communication with the jury did not involve a constitutional violation, and thus we examine the circumstances of the absence of the defendant in this case to determine if there was a reasonable possibility of prejudice. The judge solicited counsel for the defense and for the Government for their comments and objections to all substantive responses he proposed to give to the jury. The defense was given the opportunity to object to each substantive communication before it was relayed to the jury. Moreover, before the jury announced its verdict, the

---

**1.** We discuss the requests and responses with regard to the dictionary separately in the following section. The other substantive queries and responses are set forth in the appendix.

court, in no uncertain terms, gave the defense the opportunity to make a record for appeal. Neither at that time nor during its motion for a new trial did the defense argue that a particular communication was substantively improper. Nor does the defendant now disagree with the substance of any of the answers. His generalized complaint amounts to a request that this court establish a per se rule that any *ex parte* communication in the defendant's absence requires reversal, a request that must fail in light of the authority that reversal is not required when there is no reasonable possibility of prejudice.

■ The opportunity afforded defense counsel to suggest appropriate responses to jury questions and to state objections to each substantive response formulated by the court, as well as the lack of any showing that the responses were substantively incorrect or in any way prejudicial, lead us to conclude that the presence of the defendant would not have affected the outcome, or, indeed, even the substance, of the communications. Thus, we find no reasonable possibility of prejudice.

### C. *The Dictionary*

We now consider whether it constituted reversible error for the district judge, in response to a jury request, to give to the jury a dictionary without consulting counsel. The judge gave the jury the dictionary with the cautionary instruction that "where the court has provided you with definitions and explanations of terms in its instructions to you, those definitions and explanations must control. You must not resort to the dictionary definition for guidance in interpreting the terms defined for and explained to you in the court's instructions." Shortly thereafter the district judge reconsidered and removed the dictionary with the following direction: "You are instructed that you must disregard completely any and all definitions obtained from its use. You are to base your decision solely upon the evidence admitted during trial and the instructions given to you at the end of the testimonial portion of the trial."

In *United States v. Birges,* the defendant also challenged the trial court's accession to a request for a dictionary, complaining that a "dictionary is a supplemental instruction, requiring counsel to be informed and defendant to be present, pursuant to Fed.R.Crim.P. 43." 723 F.2d at 670. We agreed that giving the dictionary to the jury was error and noted that "[q]uestions or disputes as to the meaning of terms which arise during jury deliberations should be settled by the court after consultation with counsel, in supplemental instructions." *Id.* at 670–71. We did not reverse, however, since the record did "not demonstrate that any prejudice occurred as a result" of the introduction of a dictionary into the jury's deliberation. *Id.* at 671.

■ The district judge, in this case, erred in giving the dictionary to the jury. The Government had an obligation to prove that the presence of the dictionary was harmless beyond a reasonable doubt. *United States v. Littlefield,* 752 F.2d 1429, 1431–32 (9th Cir. 1985); *Gibson v. Clanon,* 633 F.2d 851, 855 (9th Cir. 1980), *cert. denied* 450 U.S. 1035, 101 S.Ct. 1749, 68 L.Ed.2d 231 (1981). In addition to the cautionary and curative instructions, the Government submitted affidavits from three jurors stating that the dictionary was consulted for the definitions of only two words, "response" and "consummate," neither one critical in this case involving informational and organizational picketing and perjury. The Government attorney also submitted his own affidavit reporting conversations he had with six other jurors, which were consistent with the affidavits of the three jurors. The considerations set forth in *Gibson* in evaluating whether there was a reasonable doubt that the extrinsic material influenced the verdict were (1) the strength of the Government's case; (2) the importance of the extraneous evidence; and (3) the trial judge's assessment of the error. Here, the Government's case was clear-cut. The words whose definitions were ascertained had negligible bearing on the case. Finally, the judge assessed the error as harmless. He found the credibility of the

Government's witnesses superior to that of Kupau's and noted that, while the jury took a number of days to reach its verdict, he "never had any doubt at any time that [the jury] might have been deadlocked. . . . [J]udging from the notes it seemed that [the jury had] made a very systematic and methodical consideration of facts." We conclude that the error was harmless beyond a reasonable doubt.

### D. Exclusion of Expert's Linguistics Testimony

■ The Government introduced the testimony of Thomas W. Cestare concerning the law governing informational and organizational picketing. The parties stipulated that Cestare, who headed the Honolulu office of the NLRB, was an expert in the fields of labor law, labor management relations, and collective bargaining agreements. During his testimony, Cestare gave his explanation of the meaning of certain labor law terms used by Kupau in his taped conversations with Mungovan. These opinions constituted relevant, probative evidence harmful to Kupau. To rebut the negative inference to which this interpretation of these tapes gave rise, the defense attempted to introduce the expert testimony of a linguist, Roger Shuy. The court excluded the proffered testimony as unnecessary. (See Fed.R.Evid. 702 (Expert testimony admissible where it "will assist the trier of fact to understand the evidence or to determine a fact in issue."))

A "district court's decision to exclude expert testimony will be upheld unless manifestly erroneous." United States v. Byers, 730 F.2d 568, 571 (9th Cir.), cert. denied, —— U.S. ——, 105 S.Ct. 333, 83 L.Ed.2d 270 (1984). The district court's decision was not manifestly erroneous. Shuy would have testified as to Kupau's intent based on the expert's analysis of an ordinary, brief conversation from aspects such as linguistics, discourse analysis, conversational analysis, structural analysis, topic recycling, topic clustering, response analysis, referencing analysis, language function analysis, and contrastive analysis. Such testimony was aimed not at explain-

ing technical terms used in the conversation, as was the testimony of the labor expert. Instead, this expert sought to interpret language in ordinary usage, which the district court found would have confused, not assisted, the jury. We find that it was not error to exclude Shuy's testimony. See United States v. Hearst, 563 F.2d 1331, 1349–50 (9th Cir.1977), cert. denied, 435 U.S. 1000, 98 S.Ct. 1656, 56 L.Ed.2d 90 (1978) (exclusion of expert linguist's testimony upheld); see also United States v. Schmidt, 711 F.2d 595, 598–99 (5th Cir. 1983), cert. denied, 464 U.S. 1041, 104 S.Ct. 705, 79 L.Ed.2d 169 (1984) (exclusion of expert linguist's testimony upheld).

### E. Exclusion of Other Testimony

■ The prosecution introduced the testimony of Dennis Chang, an attorney for the union. Chang had drafted the affidavits that Kupau signed and submitted to the court. These affidavits formed the basis of counts one through three. The defense sought on cross-examination to elicit from Attorney Chang whether, at the time of the signing, Chang "believed that Mr. Kupau believed [the affidavits] to be true." The prosecution objected and the court sustained the objection. In the absence of an offer of proof of what the testimony would have been, and there was none in this case, reversal will lie only where there is plain error. Fed.R.Evid. 103. Since Chang's opinion of Kupau's state of mind would have constituted speculation, the judge did not plainly err in excluding it. "A witness may not testify to a matter unless evidence is introduced sufficient to support a finding that he has personal knowledge of the matter." Fed.R.Evid. 602. At the time of the questions and objections, no testimony had been introduced that Kupau had made statements to Chang revealing his state of mind. Further, as the district court noted, the opinion of Kupau's beliefs held by Chang at the time he drafted the affidavits was irrelevant.

### CONCLUSION

The contentions of the defendant are without merit. The judgment of the trial court is AFFIRMED.

## APPENDIX

The substantive queries and relevant responses were as follows:

Q: 1) We would like to request a copy of the judge's instruction to the jury.

A: 1) [A]ttached hereto is a copy of the court's instructions to the jury as read to you on this date.

Q: 2) Could we please have the following

   1. List of the witnesses and the order they appeared?

   ....

   3. Transcript of present trial?

A: 2) 1. List of witnesses is attached

   ....

   3. A copy of the transcript for this trial cannot be provided. Please be informed that it would take several weeks for the court reporters to transcribe their notes for the entire trial. You are therefore requested to recollect to the best of your ability the testimony in this trial.

Q: 3) Could we please have a list of descriptions of the transcripts before us?

A: 3) I have consulted with the attorneys on ... your request, and the attorneys wish me to ask you the following questions:

   1. What do you mean by "transcript," and

   2. What do you mean when you say "description" of the transcript. Please identify the exhibit numbers of the "transcripts" you are referring to.

Q: 4) We would like the lists of the plaintiff's and defendant's exhibits with numbers, dates, and a brief description. I.e., Defendant's exhibit 44 —Whose house, what date? (photo)

A: 4) I have contacted both attorneys to require their presence in this courthouse, in order that they review each others' description of their exhibit list, as to whether the description given actually complies with the testimony presented in court.

This procedure, however, will necessarily require more than an hour to complete, as certain attorneys will have to come from their office to the courthouse.

With reference to certain exhibits as to photos, and your request of its description and date, both attorneys will have to recall whether or not such testimony was given.

In the event there was no actual testimony given in court, none can be provided now, because the trial has concluded.

Q: 5) Please refresh our memory ... who was witness Gordon Yanagawa (his present and/or past working position for whom?)? Also the same for Dennis Yoshida?

Would you please furnish someone to play the reel-to-reel tapes for us?

Could you please tell us the job titles and companies connected with witness William Bothelho, Jack Craig, Don Horio, James Westlake?

A: 5) [Witness identifications given by respective counsel during special hearing. Hilton Lui furnished to play tapes, as discussed in opinion.]

Q: 6) Would you please identify Gov exhibits' 5A, 5B, 5C, 6A, 6B, and 6C?

A: 6) All transcripts starting with "5" refer to excerpts of the September 3, 1982 grand jury testimony of Walter Kupau.

All transcripts starting with "6" refer to excerpts from the May 11, 1983 trial testimony of Walter Kupau.

Q & A: 7) [These concerned the dictionary and are discussed in opinion.]

Q: 8) Could we please listen to the enhanced version of the tape between Mr. Mungovan and Mr. Kupau of Feb. 27, 1981 [and] Defendant's exhibit 20 and Government exhibit 35 after lunch? (Approx. 2 P.M.)

A: 8) [Y]ou are advised that the enhanced version of the Mungovan/Kupau tape will be played as you have requested with the same technician in the person of agent Hilton Lui, provid-

ing the technical assistance in this case. You are cautioned, as previously, that agent Lui will not be allowed to answer any questions, and his presence during the time of the replay will only be for the purpose of technical assistance.

Q: 9) Would you please clarify in laymen's terms the 4 points for decision in number 7?

A: 9) You are instructed that you must base your verdict on the instructions as given to you at the close of testimonial portion of the trial. I am not permitted to clarify the instruction in the manner that you have requested.

Q: 10) Does the attached page refer to Count 1–6? 1–7? Only 7? If the latter is true, does this page have jurisdiction over the 4 elements or are they equal in making our decision? (Please return the page.)

A: 10) You should know that this page is the applicable statute for count 7 only.

The four elements on which you were instructed constitute the elements each of which the government must prove beyond a reasonable doubt, in order to obtain a conviction under this statute. Before you may return a verdict of guilty for count 7, you must find that the government has proven each of the four elements beyond a reasonable doubt.

Non-substantive notes requested such items as chalk, a blackboard, an eraser, paychecks, a pencil sharpener, masking tape, coffee cups, and adjournment for lunch or for the day.