956 F.2d 270
 NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
UNITED STATES of America, Plaintiff-Appellee,
v.
Richard Winn HENDERSON, Defendant-Appellant.
 No. 91-5161.
 United States Court of Appeals, Sixth Circuit.
 Feb. 26, 1992.
 
 Before KENNEDY and RALPH B. GUY, Jr., Circuit Judges; and LIVELY, Senior Circuit Judge.
 PER CURIAM:
 
 
 1
 Defendant-appellant Richard Winn Henderson appeals his jury conviction for attempting to bribe an Assistant United States Attorney in an effort to stop a criminal investigation. Defendant argues that the District Court erred in denying his motion for directed verdict due to entrapment, by disallowing the testimony of a linguistics expert, and in imposing separate sentences for two statutory violations which should have been treated as one violation. Because we find that the convictions on two counts of bribery constitute double jeopardy, we REMAND to the District Court for a dismissal of one of the counts.
 
 I.
 
 2
 Defendant was a medical doctor practicing in Knoxville, Tennessee. He operated a medical clinic and employed Mrs. Alex Wright ("Wright") as a receptionist. During the course of Wright's employment, defendant and Wright fell in love. She remained at the clinic performing various administrative duties. Defendant paid attorney's fees for Wright, provided other financial support, and furnished an apartment in his home for her and her family. Eventually, Wright and defendant had a disagreement and terminated their relationship.
 
 
 3
 Following their disagreement, Wright contacted her attorney regarding her knowledge of illegal activities by defendant. The attorney advised her to communicate this knowledge to the Knoxville Narcotics Unit. The Narcotics Unit and the Drug Enforcement Administration ("DEA") began an investigation of the clinic for abuse of valium and other controlled substances. An administrative search was conducted, a search warrant obtained, and many patient records seized. Eventually, a federal investigation concerning defendant's activities was initiated before a federal grand jury.
 
 
 4
 Wright was reemployed by defendant subsequent to the search of the clinic and their personal relationship resumed. Wright stated that defendant questioned her early in the investigation about whether she had spoken to authorities to which she admitted. She also stated that defendant fired her at one other time when her sister told him of her involvement with the DEA. Wright was subpoenaed to appear before the federal grand jury on June 20, 1990. Defendant was aware that Wright had received the subpoena and had seen the actual document.
 
 
 5
 At the time the grand jury investigation began, defendant consulted an attorney. The attorney informed him that it would cost approximately $50,000 to do a "mirror image" investigation and to negotiate with the United States Attorney's Office in an effort to stop the investigation. At this point, the stories of Wright and defendant conflict. Wright stated that defendant told her on May 29, 1990 that he had information that various persons on the United States Attorney's staff could be bribed. Wright claims that defendant then asked her to bribe either a United States Attorney or a grand jury foreman with sex or money. Wright contacted Special Agent Stan Persinger of the DEA and arranged to tape further discussion concerning potential bribes. In a recorded conversation, defendant asked Wright to compromise Assistant United States Attorney Mike Mitchell ("Mitchell"). In a subsequent conversation, defendant asked Wright to use her contact with Mitchell to obtain a FBI "rap sheet" on an employee of the clinic. The sheet was obtained with the cooperation of the FBI. Arrangements were made for $10,000 to be paid to Mitchell's brother-in-law for the rap sheet and a gesture of good faith in future arrangements to fix the case and investigation against defendant.[1] Wright made the $10,000 payment on June 19, 1990. Wright told defendant that the previous payment resulted in her being excused from her grand jury appearance. The excusal had been arranged by the FBI and the United States Attorney's Office.
 
 
 6
 On July 11, 1990, Wright claims that defendant met with her to make plans for a final bribe. He wanted to receive confirmation that the case against him had been dropped before making the payment. On July 13, 1990, Wright and defendant met with the undercover FBI agent posing as Mitchell's brother-in-law and gave the agent $20,000. The agent gave defendant a memorandum, signed by Mitchell, confirming that the charges against defendant had been dropped. Defendant compared the signature on the memorandum with the signature on Wright's grand jury subpoena to verify Mitchell's signature. Following the transaction, defendant was arrested.
 
 
 7
 Defendant claims the initial suggestion of bribing an official came from a private investigator he hired to determine if his offices and telephones were wired. Defendant asserts that he rejected the idea of bribing an official because it was illegal. Defendant then claims that he told Wright of the investigator's suggestion after which she contacted the DEA and told them that defendant was going to try to bribe someone. Defendant argues that the tapes of his meetings with Wright merely indicate that she obtained the FBI rap sheet to establish credibility, that Wright told defendant that Mitchell needed money, and that she encouraged defendant to bribe Mitchell. In June 1990, defendant contends that he contacted an attorney and told him about the proposed scheme and was told he was being set up and that the activities were illegal. Defendant then claims that Wright convinced him that she would take care of it and take all the risks.
 
 
 8
 Defendant was indicted on July 18, 1990 and charged with one count of violating 18 U.S.C. § 201(b)(1)(A), promising money to influence an official act of an Assistant United States Attorney, that is, the decision whether to prosecute the defendant. He was also charged with one count of violating 18 U.S.C. § 201(b)(1)(C), promising money to induce an Assistant United States Attorney not to investigate or prosecute with the intent to cause the Assistant United States Attorney to do or omit to do acts in violation of the lawful duties of his office. Defendant entered pleas of not guilty and the case went to trial. On November 14, 1990, the jury found defendant guilty of both counts. He was sentenced to 33 months imprisonment on each count to run concurrently. Defendant filed a timely notice of appeal.
 
 II.
 
 9
 Defendant asserts that he was entrapped through the FBI's and DEA's use of Wright. He contends that the government failed to meet its burden of proving predisposition beyond a reasonable doubt. Therefore, the judge erred in denying the defense counsel's motion for judgment of acquittal and in sending the issue of entrapment to the jury. We find this argument to be without merit.
 
 
 10
 The United States Supreme Court has held that a valid entrapment defense is asserted when the defendant shows 1) government inducement of the crime, and 2) lack of predisposition on the part of the defendant to engage in the criminal conduct. Matthews v. United States, 485 U.S. 58 (1988). Predisposition concerns the defendant's state of mind and whether he was unwary and innocent or whether he was ready to avail himself of the opportunity to commit the crime. United States v. Russell, 411 U.S. 423, 436 (1973); Sherman v. United States, 356 U.S. 369 (1958). Once a defendant has raised the issue of entrapment, the burden of proof shifts to the government to prove beyond a reasonable doubt that the defendant was predisposed to commit the crime. United States v. Meyers, 803 F.2d 246, 249 (6th Cir.1986) cert. denied, 480 U.S. 936 (1987).
 
 
 11
 Predisposition can be defined as a readiness to break the law. The defendant's state of mind "before his initial exposure to government agents" is critical to this determination. United States v. McLeron, 746 F.2d 1098, 1112 (6th Cir.1984). The District Court was required to grant defendant's motion for acquittal only if it determined that the issue of predisposition and entrapment was clear as a matter of law and no factual issue existed for the jury to decide. This Court has held that in order for an entrapment defense to succeed as a matter of law,
 
 
 12
 the testimony and facts must be undisputed; a court may not choose between conflicting testimony or make credibility determinations ... [T]he undisputed evidence must demonstrate a 'patently clear' absence of predisposition.
 
 
 13
 United States v. Pennel, 737 F.2d 521, 534 (6th Cir.1984), cert. denied, 469 U.S. 1158 (1985).
 
 
 14
 In this case it is clear that the defendant has failed to meet the standard established by Pennel. Defendant and Wright present conflicting testimony which cannot be resolved without making some type of credibility determination. If the jury determined that Wright's testimony was credible, they could find that no contact between Wright and the federal authorities occurred until after defendant had conceived and was considering the idea of bribing a public official. In addition, Wright's testimony suggests that her role in encouraging defendant's activity was not a substantial or domineering one. Defendant's testimony, while presenting another view of the events, does not conclusively prove entrapment as a matter of law. Rather, the testimonies, together with the tape-recorded conversations, present a factual issue for jury determination.
 
 III.
 
 15
 Defendant also protests the District Court's refusal to allow testimony of a linguistics expert. During the trial, defendant presented a report by Dr. Bethany Dumas who is a linguistics and voice analysis expert. The defendant anticipated that Dr. Dumas would explain problems with consensual tape recordings and provide an opinion that the tapes did not conclusively show predisposition on the part of the defendant. A report prepared by Dr. Dumas presented the results of an examination of the tape recordings and the transcripts of those recordings. Defense counsel admitted that the testimony was not scientific but constituted an opinion by an expert. The United States objected to the report as being a violation of Fed.R.Civ.P. 16 and on the basis that the testimony and opinions would mislead and confuse the jury.[2] The District Court ruled that the issues which the expert would address were questions to be resolved by the jury and that to allow the testimony would "invade[ ] the province of the jury on the critical issues in this case." Further, the expert's opinion was not needed to aid the jury since the jury was capable of listening to the tapes and exhibiting the common sense necessary for the determination of the issues of the case. This Court may overturn the District Court's decision relating to the admissibility of expert testimony only if the decision is "manifestly erroneous." Congress & Empire Spring Co. v. Edgar, 99 U.S. 645, 658 (1878); United States v. Green, 548 F.2d 1261, 1268 (6th Cir.1977).
 
 
 16
 This Circuit has established a four-prong test to be used when reviewing a district court's decision on the admissibility of expert testimony. The four criteria are "1) qualified expert; (2) proper subject; (3) conformity to a generally accepted explanatory theory; and (4) probative value compared to prejudicial effect." Green, 548 F.2d at 1268 (quoting United States v. Pamaral, 488 F.2d 1148, 1156 (1973)). The two criteria that we consider in this case are whether the expert testimony offered was on a proper subject and whether the probative value of the testimony outweighed the prejudicial effect.
 
 
 17
 Dr. Dumas' testimony would have explained five factors which the jury could have considered when drawing conclusions from the tape-recorded conversations. These factors include contextual isolation (agreement based on partial information), contamination by the microphone wearer, quality of the tape, topic cycling (who brings up various subjects), and vague or ambiguous references. As argued by the government, some of this testimony would necessarily result in an opinion on whether defendant was predisposed to commit the crime charged. By testifying about who raises issues or takes leading roles in the conversations, Dr. Dumas would be testifying directly on a question to be decided by the jury. The jury is capable of making the determinations required in this case. The testimony offered would invade the province of the jury and may lead to confusion by the jurors on an issue on which their common sense should be sufficient. Because Dr. Dumas would not be testifying on a proper subject, the prejudicial effect of rendering an opinion on a jury issue would outweigh any probative value of the evidence.
 
 
 18
 Since we find that the testimony offered does not meet the Green standards, we do not find the decision of the District Court to be erroneous. See also United States v. Edelman, 873 F.2d 791, 795 (5th Cir.1989); United States v. Devine, 787 F.2d 1086, 1088 (7th Cir.), cert. denied, 479 U.S. 848 (1986); United States v. Kupau, 781 F.2d 740 (9th Cir.), cert. denied, 479 U.S. 823 (1986); United States v. DeLuna, 763 F.2d 897, 912 (8th Cir.), cert. denied, 474 U.S. 980 (1985). The assertion that the District Court did not have adequate grounds to render its decision because it had not read Dr. Dumas' report is without foundation.
 
 IV.
 
 19
 Defendant was indicted on two different counts of paying money to an Assistant United States Attorney. He claims that because there was only one transaction and only one set of facts necessary to prove both of the charges, the District Court erred in failing to dismiss one of the counts prior to sending the case to the jury. We agree.
 
 
 20
 Count I of the indictment charged defendant with an offense under 18 U.S.C. § 201(b)(1)(A), specifically,
 
 
 21
 the defendant ... did unlawfully, knowingly, intentionally, directly and indirectly, corruptly cause to be given, caused to be offered, and cause to be promised money to a public official ... to influence an official act, that is the decision of whether or not to prosecute the defendant.
 
 
 22
 Count II, charging defendant with an offense under 18 U.S.C. § 201(b)(1)(C), stated,
 
 
 23
 the defendant ... did unlawfully, knowingly, intentionally, directly and indirectly, corruptly cause to be given, caused to be offered, and cause to be promised money to a public official ... to induce the said Assistant United States Attorney to not investigate or prosecute the defendant.
 
 
 24
 Joint App. at 6-7.
 
 
 25
 The Supreme Court has found that the double jeopardy clause of the Constitution protects against multiple punishments for the same offense. Grady v. Corbin, 493 U.S. 953 (1989). If the offenses charged in a case have identical statutory elements, or if one is a lesser included offense of the other, the prosecution of one of the offenses is barred. The offenses must be examined to determine "whether each provision requires proof of a fact which the other does not." Blockburger v. United States, 284 U.S. 299 (1932).
 
 
 26
 The government argues that Counts I and II differ because the first count charges defendant with "influencing an official act" and the second count charges him with "inducing" the U.S. Attorney to do an act in violation of his lawful duties. As the defendant notes in his brief, the dictionary definitions of "influence" and "induce" cross-reference each other.[3]
 
 
 27
 The government argues that, even if influence and induce are similar actions, Congress, in passing section 201, wished to establish different intents on the part of a defendant: including the intent to influence any official act, intent to influence the official to commit or allow any fraud, and intent to induce the official to do or omit any act in violation of the official's duties. Thus, the government argues, these different intents render the proofs offered for each count different from the proof needed to establish the other count. We find that in this case the intent to influence and the intent to induce are not separable and are shown by proof of the same facts; the intent which must be established for each count is the same. In finding defendant guilty of Count I, the jury must have found that he intended to influence an official act, that is, the decision of the Assistant United States Attorney whether to prosecute. In finding him guilty of Count II, the jury must have found that defendant intended to induce the Assistant United States Attorney not to prosecute in violation of his lawful duty to do so. In inducing the Assistant United States Attorney not to prosecute, defendant was necessarily influencing his decision of whether or not to prosecute. In both cases defendant's intent was to persuade the Assistant United States Attorney not to prosecute.
 
 
 28
 For the reasons stated above, we find that the District Court erred in failing to dismiss one of the counts at sentencing. We REMAND the case to the District Court with instructions to permit the United States to elect which of the counts should be dismissed. In all other respects, the judgment of the District Court is AFFIRMED.
 
 
 
 [1]
 The brother-in-law was in fact an FBI undercover agent
 
 
 [2]
 The Rule 16 violation alleged was failure to provide reciprocal discovery mandated by the pre-trial order
 
 
 [3]
 "Influence" is defined as "[p]ower exerted over others. To affect, modify or act upon by physical, mental or moral power...." Black's Law Dictionary 779 (6th Ed.1990). "Induce" is defined: "To bring on or about, to affect, cause, to influence to an act or course of conduct...." Id. at 775. Webster includes in its definitions of "induce"; "Influence, persuade." Webster's Third New International Dictionary (1971)