KEITH, Senior Circuit Judge,
dissenting:
I respectfully dissent from the majority’s opinion. It is axiomatic that the Constitution prohibits jurors from going outside of the record to independently determine the standards that are to be used when deciding an accused person’s guilt or innocence. This is based on many sound principles; most importantly, the reality that such standards frequently differ from the governing rule and, thus, undermine the basic precept that all persons are guaranteed due process and equal protection under the law. Such concerns are not to be taken lightly. Were we to treat such violations cavalierly, it would open the floodgates to jurors ignoring the instructions of the court and, in essence, the responsibilities entrusted them by the Constitution.
I. Analysis
As the majority notes, the appropriate question when considering a defendant’s *110 petition for writ of habeas corpus is whether the state court’s decision was contrary to, or involved an unreasonable application of clearly established federal law. See 28 U.S.C.A. § 2254(d)(1). “Clearly established federal law” under § 2254(d)(1) refers to the governing legal principle or principles set forth by the Supreme Court at the time the state court rendered its decision. Bell v. Cone, 535 U.S. 685, 698, 122 S.Ct. 1843, 152 L.Ed.2d 914 (2002); Williams v. Taylor, 529 U.S. 362, 405, 413, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000).
Even if the state court proceedings violated clearly established law, the court may not grant a defendant’s petition for relief if the error was harmless. Jones v. Polk, 401 F.3d 257, 265 (4th Cir.2005). The habeas petitioner will be entitled to relief if a habeas court is “in grave doubt about whether a trial error of federal law had substantial and injurious effect or influence in determining the jury’s verdict.” O’Neal v. McAninch, 513 U.S. 432, 436, 115 S.Ct. 992, 130 L.Ed.2d 947 (1995) (internal quotation marks and citation omitted). “[Gjrave doubt exists when, in the relevant circumstances, the question is so evenly balanced that the reviewing court finds itself in virtual equipoise on the harmlessness issue.” Barbe v. McBride, 521 F.3d 443, 461 (4th Cir.2008) (internal quotation marks and citations omitted). The test is whether it can be said with fair assurance that not a single juror’s decision was swayed by resort to the extrinsic influence. Parker v. Gladden, 385 U.S. 363, 366, 87 S.Ct. 468, 17 L.Ed.2d 420 (1966) (A defendant is “entitled to be tried by 12, not 9 or even 10, impartial and unprejudiced jurors.”); Fullwood v. Lee, 290 F.3d 663, 678 (4th Cir.2002) (“[I]f even a single juror’s impartiality is overcome by an improper extraneous influence, the accused has been deprived of the right to an impartial jury.”); Lawson v. Borg, 60 F.3d 608, 613 (9th Cir.1995) (noting that if even one juror was improperly influenced the verdict must be reversed).
A. The Trial Court Unreasonably Applied Established Supreme Court Precedent.
The Sixth Amendment provides, in relevant part, that “the accused shall enjoy the right to a ... trial[ ] by an impartial jury ... [and to] be confronted with the witnesses against him.” U.S. Const. Amend. VI. The right to trial by an impartial jury “guarantees ... a fair trial by a panel of impartial, indifferent jurors.” Irvin v. Dowd, 366 U.S. 717, 722, 81 S.Ct. 1639, 6 L.Ed.2d 751 (1961) (internal quotation marks omitted). This right prohibits “any private communication, contact, or tampering directly or indirectly, with a juror during trial about the matter pending before the jury.” Remmer v. United States, 347 U.S. 227, 229, 74 S.Ct. 450, 98 L.Ed. 654 (1954).
As the Fourth Circuit has interpreted the relevant Supreme Court precedent, all influences, outside the record, on a juror’s decisions are not necessarily prohibited. The Supreme Court has clearly established that while external influences on a jury’s deliberations are prohibited, internal ones are permissible. Robinson v. Polk, 438 F.3d 350, 362 (4th Cir.2006).
Under established Supreme Court case law, an influence is external if it (1) is extraneous prejudicial information; i.e., information that was not admitted into evidence but nevertheless bears on a fact at issue in the case or (2) is an outside influence upon the partiality of the jury, such as private communication, contact, or tampering ... with a juror.
Id. at 363 (internal quotation marks and citations omitted). Examples of internal influences include alcohol or drugs taken by a juror, Turner, 379 U.S. at 466, 85 *111 S.Ct. 546, or Bible readings which a juror relies upon for the purpose of “examining his or her own conscience from within,” Robinson, 438 F.3d at 363-64.
It is clear under the Supreme Court’s precedents that when the jury relies on a source outside of its own knowledge or beliefs, not presented at trial or by the trial judge as part of his or her instructions, to determine what relevant law to apply, the jury has been subject to an “external influence” in violation of the Sixth Amendment to the United States Constitution. Rogers v. United States, 422 U.S. 35, 95 S.Ct. 2091, 45 L.Ed.2d 1 (1975) (finding violation of the Sixth Amendment where the court, without consulting the defendant, provided further instruction to the jury which the jury then relied on in convicting the defendant). See also Tanner v. United States, 483 U.S. 107, 117-18, 107 S.Ct. 2739, 97 L.Ed.2d 90 (1987) (noting the distinction between “external” influences, such as a juror reading a newspaper or hearing prejudicial statements from others, and “internal” influences); Parker, 385 U.S. at 364-66, 87 S.Ct. 468 (finding that a bailiffs statement to jurors that the defendant was a “wicked fellow” and “guilty” constituted an “outside influence” that violated the defendant’s Sixth Amendment right to fair trial and confrontation because “the evidence developed against a defendant shall come from the witness stand in a public courtroom where there is full judicial protection of the defendant’s right of confrontation, of cross-examination, and of counsel”); Turner v. Louisiana, 379 U.S. 466, 473, 85 S.Ct. 546, 13 L.Ed.2d 424 (1965) (finding a violation of defendant’s Sixth Amendment rights where two deputies who testified against him were assigned to guard, and fraternized with, the jury); Remmer v. United States, 347 U.S. 227, 229, 74 S.Ct. 450, 98 L.Ed. 654 (1954) (stating that “private communication, contact, or tampering” with the jury is presumptively prejudicial); Mattox v. United States, 146 U.S. 140, 149, 13 S.Ct. 50, 36 L.Ed. 917 (1892) (stating that “in capital cases ... the jury should pass upon the case free from external causes tending to disturb the exercise of deliberate and unbiased judgment”).
Unlike ingesting alcohol or drugs or reading a Bible to settle one’s conscience, looking up legal terms to apply in the decision-making process is not merely an “internal” matter that merely affects how one feels or facilitates an examination of what one already thinks or believes. Rather, in this case, the jury in considering the dictionary’s definitions was consulting an external source — the dictionary— specifically because they found their internal knowledge to be insufficient. See Robinson, 438 F.3d at 364 (external influences impart pressure or knowledge on “a juror apart from the juror himself, the reading of Bible passages invites the listener to examine his or her own conscience from within.”). Had the jury had the knowledge within itself, it would not have found it necessary to consult the dictionary in the first place.
Likewise, unlike reading the Bible or ingesting alcohol or drugs, consulting the dictionary to determine the applicable legal principle was not merely incidental to the issues before the jury, but was directly relevant as the jury looked up words it was instructed to apply. See id. at 363 (finding that juror’s reading of the Bible did not require reversal of the conviction because “the Bible had no bearing on any fact relevant to sentencing, and was therefore not tantamount to ‘evidence’ that was used against him at sentencing.”). Any doubt concerning the correctness of this conclusion is all but vitiated in a situation such as this where the defendant has conceded all but one legal element and the jury ac *112 quired information about this one legal element at issue.
The cases the state provides, in response, are clearly distinguishable. In none of the cases did the jurors rely on an influence to resolve a legal question or factual dispute relevant to the case before it. Wolfe v. Johnson, 565 F.3d 140 (4th Cir.2009) (finding no error where juror brought pictures of his son into jury room and another juror spoke with his wife); Robinson, 438 F.3d at 364 (finding no clearly established law prohibiting a juror from relying on Bible not to garner any external fact or legal principle merely to reflect on his own conscience); Lynch v. Polk, 204 Fed.Appx. 167 (4th Cir.2006) (same). The state’s reliance on the aforementioned cases suffers from the flawed assumption that merely because the influence of some materials may not violate the Sixth Amendment, the consideration of any and all external material does not violate the Sixth Amendment.
Beyond citing these cases, the state provides no explanation as to why it believes that a dictionary used to define the element at the center of trial constitutes a permissible internal influence as opposed to an impermissible external influence. Rather, the state simply asserts that no case has specifically found that a jury’s use of a dictionary to define the specific legal terms at issue in this case violates the Sixth Amendment. Accordingly, it concludes that the issue in this case is not clearly established.
This line of argument misconstrues the relevant legal principle. “[T]he relevant Supreme Court precedent need not be directly on point, but must provide a ‘governing legal principle’ and articulate specific considerations for lower courts to follow when applying the [relevant] precedent.” Quinn v. Haynes, 234 F.3d 837, 844 (4th Cir.2000) (citing Williams v. Taylor, 529 U.S. 362, 413, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000)); see Panetti v. Quarterman, 551 U.S. 930, 953, 127 S.Ct. 2842, 168 L.Ed.2d 662, (2007) (“That the standard is stated in general terms does not mean the application was reasonable. [The statute] does not ‘require state and federal courts to wait for some nearly identical factual pattern before a legal rule must be applied.’ ”); Lockyer v. Andrade, 538 U.S. 63, 76, 123 S.Ct. 1166, 155 L.Ed.2d 144, (2003) (“Section 2254(d)(1) permits a federal court to grant habeas relief based on the application of a governing legal principle to a set of facts different from those of the case in which the principle was announced.”).[1]
Finally, this conclusion is buttressed by the decisions of other courts which similarly have found that the reliance of a jury on a dictionary in defining the applicable legal principles violates the Sixth Amendment. See United States v. Duncan, 598 F.2d 839 (4th Cir.1979); McNeill v. Polk, 476 F.3d 206 (4th Cir.2007) (two of three judges on panel finding that juror relied on improper external influence by consulting dictionary for definition of mitigate) (King, J., concurring in judgment) (Gregory, J., dissenting in judgment); Marino v. Vasquez, 812 F.2d 499, 505 (9th Cir.1987) (“[Unauthorized reference to dictionary definitions constitutes reversible error which the State must prove harmless beyond a rea *113 sonable doubt.”); United States v. Kupau, 781 F.2d 740, 744 (9th Cir.1986), cert, denied, 479 U.S. 823, 107 S.Ct. 93, 93 L.Ed.2d 45 (1986) (same).[2]
Accordingly, while the majority assumes, without deciding that the jury’s conduct violated the Sixth amendment, no such assumptions are necessary. Under both the Supreme Court’s and this Circuit’s jurisprudence, such conduct is unconstitutional.
B. The Error had a Substantial and Injurious Effect on the Defendant.
Upon assuming that the jurors’ conduct violated the Sixth amendment, the majority erroneously rejects Bauberger’s petition on the grounds that any such error was not prejudicial to him.
In Mayhue v. St. Francis Hosp. of Wichita, Inc., 969 F.2d 919 (10th Cir.1992), the Tenth Circuit set out a five part test to use when determining whether a lower court’s error is prejudicial. The test assesses:
(1) The importance of the word or phrase being defined to the resolution of the case; (2) The extent to which the dictionary definition differs from the jury instructions or from the proper legal definition; (3) The extent to which the jury discussed and emphasized the definition; (4) The strength of the evidence and whether the jury had difficulty reaching a verdict prior to introduction of the dictionary definition; and (5) Any other factors that relate to a determination of prejudice.
Id. at 924. The test was subsequently adopted by the majority of the judges of a panel of this circuit. McNeill, 476 F.3d at 226, 229. However, the history of this circuit’s consideration of these factors is not so nascent. The Supreme Court and the Fourth Circuit have long considered each of the factors set out in Mayhue and adopted in McNeill when considering the prejudicial effect of constitutional violations. Henderson v. Kibbe, 431 U.S. 145, 154, 97 S.Ct. 1730, 52 L.Ed.2d 203 (1977)(examining the difference between the instruction given and the instruction that should have been given in determining prejudice); Barbe, 521 F.3d at 459-60 (explaining that the trial court’s error prevented the defendant from cross-examining the prosecution’s expert as to a matter “crucial to his presentation of an effective defense”); Fitzgerald v. Greene, 150 F.3d 357, 366 (4th Cir.1998) (noting that a potentially biased juror’s impact was minimal as the jury rejected his sentencing suggestion and the jury had made its decision before he made potentially prejudicial statements); Sherman v. Smith, 89 F.3d 1134, 1143 (4th Cir.1996) (concluding that “in light of all the evidence presented at trial, [the court] harbor[ed] no grave doubt” as to the minimal prejudicial effect of the juror’s “site visit.”) (internal quotation marks and citations omitted); Stockton v. Virginia, 852 F.2d 740, 746 (4th Cir.1988) (finding comment to jury by restaurant owner prejudicial where it “bore on the exact issue ... that the jurors were deliberating on at the time”); Duncan, 598 F.2d at 866 (finding error was not prejudicial as the foreman immediately squelched any discussion of dictionary definition); Cairns v. Johnson, 267 Fed.Appx. 240, 247 (4th Cir.2008) (noting that potentially erro *114 neously excluded journals were relevant to the central issue in the case). Given the well-founded basis for the application of the factors the test lists, the parties, likewise, agree on its applicability.
Nonetheless, the majority focuses its analysis primarily on the extent to which the dictionary definition differed from the jury instruction — which in and of itself was substantial — and the strength of the evidence supporting Bauberger’s conviction. It meanwhile attaches no weight to the centrality of the issue for which the jury sought assistance and the length of time for which the jury was exposed to the erroneous definitions, both of which past courts of this circuit have deemed relevant. Consideration of such in addition to a careful weighing of the important differences between the dictionary and legal definitions of the examined terms establishes that both the magistrate and district judges correctly concluded “grave doubt” existed as to the prejudicial effect of the constitutional error.
As to the first factor, the parties do not dispute that the words the jurors looked up in the dictionary were of supreme importance in this ease. As noted above, Bauberger conceded every other element, but whether he had acted with malice — the precise term the jury sought additional help in defining.
The parties, as the majority notes, do disagree as to the extent the definitions provided in the dictionary for the words “recklessly” and “wantonly” differ from their legal counterparts. The dictionary defined “recklessly” as “lack of due caution.” App. 157. The dictionary defined “wantonly” as an “arrogant recklessness of justice or the feelings of others.” Id. Bauberger argues that the jury’s use of these definitions effectively lowered the standard for malice to something more equivalent to negligence. The state argues, and the majority agrees, that the standard imposed by these terms is virtually identical to their legal counterpart.
To understand the effect these definitions had on the jury, one must examine, as the majority does, the trial judge’s charge to the jury on malice, of which the disputed words were part. The judge’s instruction to the jury on malice provided that “[mjalice arises when an act which is inherently dangerous to human life is intentionally done so recklessly and wantonly as to manifest a mind utterly without regard for human life and social duty and deliberately bent on mischief.” Tr. Vol. IV at 38 (Emphasis added). The trial judge contrasted this standard with the more lenient one applicable to involuntary manslaughter, with which Bauberger was also charged. To be guilty of involuntary manslaughter, the defendant must have acted with “culpable negligence.” “Culpable negligence,” the court explained, requires either (1) a “willful, wanton, or intentional” violation of law governing the operation of a motor vehicle, or (2) an “inadvertent or unintentional violation of the law” that is “accompanied by recklessness of probable consequences of a dangerous nature when tested by the rule of reasonable foresight amounting altogether to a thoughtless disregard of consequences or a heedless indifference to the safety of others.” Trial Tr. Vol. VI at 21-22. The trial judge also instructed the jury on the meaning of “reckless” in the context of reckless driving, which required that the jury find Bauberger “acted carelessly and heedlessly in willful or wanton disregard of the rights or safety of others.” Id.
The North Carolina courts have clearly stated, as the majority acknowledges, “malice” for the purposes of murder requires “a high degree of recklessness.” State v. Rich, 351 N.C. 386, 527 S.E.2d 299, 303 (2000). However, even in contrast *115 with the trial court’s instruction regarding the meaning of “reckless” in the context of reckless driving, the dictionary definition — lack of due caution — sets a low standard. It seems clear that a person may have acted without due caution, but not necessarily in willful or wanton disregard of the rights or safety of others. Stated otherwise, there may be many circumstances in which a person may not have exercised proper caution (thereby acting recklessly as defined by the dictionary) but may not necessarily have acted with willful or wanton disregard for the rights or safety of others. Bauberger correctly points out that the dictionary’s definition of recklessness, because it does not require that the disregard for others be willful or wanton, resembles the legal standard for negligence.
North Carolina courts have similarly interpreted wantonness, in the criminal context, as requiring more than a mere unintentional disregard of others. “Wantonness ... connotes intentional wrongdoing. ... Conduct is wanton when in conscious and intentional disregard of and indifference to the rights and safety of others.” State v. Williams, 284 N.C. 67, 199 S.E.2d 409, 412 (1973) (internal quotation marks and citation omitted) (emphasis added). Furthermore, “[t]he words ‘willful’ and ‘wanton’ have substantially the same meaning when used in reference to the requisite state of mind for a violation of a criminal statute.” State v. Davis, 86 N.C.App. 25, 356 S.E.2d 607, 610 (1987) (citing Williams 199 S.E.2d at 412). “ ‘Willful’ as used in criminal statutes means the wrongful doing of an act without justification or excuse, or the commission of an act purposely and deliberately in violation of the law.” Id. at 610. The dictionary in contrast defined “wanton” as the “arrogant recklessness of justice or the feelings of others.” App. 157. Again, the dictionary definition imposed a more lenient standard. Not every act which is in arrogant disregard of others will necessarily involve a conscious and intentional disregard of others. Rather, as noted above, the dictionary’s definition, because it does not require that the disregard be conscious or intentional, resembles the lower standard of negligence.
The state argues, and the majority agrees, that even if the jury attached the lower standard associated with each of the term’s dictionary definitions, when the terms are read in the context of the overall instruction for malice their insertion could only have had a minimal effect. The majority emphasizes that a reading of the instruction as a whole shows that the criminal act must still have been “intentionally done” and “manifested] a mind utterly without regard for human life and social duty and deliberately bent on mischief.” In actuality, the majority by simply emphasizing that these words are present in the instruction, regardless of their placement, views them in isolation and out of context. In doing so, it ignores both the instruction’s text and the facts of this case.
The instruction, on its face, has two separate parts. Under the instruction’s terms, for an individual to have acted with malice, he must not only have committed the act intentionally, but also acted in willful or wanton disregard of the risk his actions posed, i.e., he must have been aware of the risk his actions entailed and disregarded them nonetheless. As noted, the dictionary definition of reckless — lack of due caution — requires no such awareness. Accordingly, as the instruction read to the jury, Bauberger must a) have committed an intentional act; and b) done so in spite of the fact a grave danger existed — whether or not he was aware of it. To simply conflate the instruction’s two *116 parts, and assume the jury likewise did so, ignores the instruction’s plain construction.
Importantly, this conclusion is further undercut by the jury’s actions. Had the jury imputed “intentionally” to the whole instruction, as the majority suggests, it is not clear why the foreman would have so felt the need to define the following scienter terms that he, on his lunch break, would have gone out of his way to obtain further assistance.
Likewise, pursuant to the third factor, there is strong reason to believe that the jury placed significant emphasis on the terms for which they garnered definitions. The relevant considerations under this factor include the number of jurors exposed to the potentially prejudicial information, at what point in their deliberations they received the violative material and the length of time they considered it. See, e.g., Fitzgerald, 150 F.3d at 366 (noting that a potentially biased member’s impact was minimal as jury rejected her sentencing suggestion and they had made their decision before she made potentially prejudicial statements).
It is undisputed that several members of the jury requested further instruction from the judge on the definition of malice, of which the terms they looked up are part. Likewise, the parties do not dispute that once the foreman retrieved the dictionary, the definitions for the disputed terms were shared with all twelve of the jurors. It is relevant that it was the foreman who was responsible for obtaining the dictionary and sharing it with other jurors. That he was the party providing the definitions suggests that the other jurors may have attached additional weight to the external information. See Mayhue, 969 F.2d at 925. Finally, it is notable that the foreman obtained the definitions relatively early in the jury’s deliberative process.
The state argues, and the majority agrees, the fact that the jury deliberated for more than four hours after acquiring the dictionary definitions before reaching a verdict indicates that the dictionary had little or no effect. While this is relevant, it is not as conclusive as the state presumes. The state misconstrues the appropriate question before the court. As noted above, the relevant question is merely whether one individual was affected by the dictionary. Accordingly, even if one vote shifted as a result of the dictionary’s use, the violation had a prejudicial effect.
The fourth factor — the strength of evidence and the difficulty of the jury in reaching a verdict — weighs in favor of the state. As the majority notes, there is substantial evidence that the defendant acted with malice.
Nonetheless, there is evidence that the jury, despite the aforementioned evidence, struggled to decide whether malice existed. The jury requested additional clarification as to the meaning of the term “malice.” During lunch, the foreman took the unusual step of going to the library to acquire a dictionary to aid the jury in determining whether the evidence was sufficient to support a finding of malice. However, even after returning from lunch, receiving the additional materials requested and reviewing the dictionary, the jury needed multiple votes and an Allen charge before it found Bauberger guilty.
Considering all these factors, the question of whether the jury’s consideration of the dictionary was prejudicial is a close question. Factors weighing in favor of a finding of prejudice are that the jury sought evidence directly relevant to the sole disputed legal issue, and the substantial difference between the terms as defined in the dictionary and as they are defined by North Carolina Courts. However, the substantial evidence justifying a *117 finding of malice weighs against a finding of prejudice. Ultimately, my conclusion that the constitutional violation was prejudicial is based on two realities. First, while, as a legal matter, there may have been substantial evidence of malice, the jury obviously did not see the situation as such. As noted, the foreman felt it necessary to go to the library, and the other members of the jury likewise felt it necessary to request additional information regarding the legal rules to apply. Even once these pieces of information had been provided, only after an Allen charge and multiple votes did the jury reach its conclusion. Second, as noted above, the defendant, to garner a new trial, need not prove that the result was a proximate result of the impropriety, but merely that the evidence is in virtual equipoise that his trial may have been affected.
Given the centrality of the issue to the case, the substantial difference in the standard applied and that which was appropriate and the jury’s struggles to resolve the issue, I, like the district court, find that Bauberger has raised grave doubt as to whether the jury’s decision was in fact unbiased.
II. Conclusion
The Constitution’s protections exist not only because they ensure that all persons are treated fairly and equally by our criminal justice system, but because they speak to the integrity and values of the nation and its residents. Therefore, when these rights are infringed, it hurts us all.
Today’s majority opinion concerns me deeply. With it, we embark down a dangerous road which permits jurors to go outside of the record to determine guilt or innocence. Such conduct threatens to open a Pandora’s box of unconstitutional behavior. It creates the potential for a system in which any juror may determine another human being’s guilt on nothing more than a whim; a system more worthy of Kafka than the Constitution. With these thoughts in mind, I respectfully DISSENT from today’s majority opinion.

. The state posits in its reply brief that it is not arguing that the Supreme Court must have decided an identical issue before a federal court may grant a petition for habeas relief, merely that the Supreme Court has not decided that looking up the words which the jurors looked up in this case violated the Sixth Amendment. This argument is obviously internally inconsistent. The state at once argues that it is not arguing that there must be an identical case and then complains that there is not an identical case.

. As the district court noted, ”[t]he unreasonableness of a state court’s application of ... [the relevant] Supreme Court jurisprudence cannot be established by decisions of lower federal courts or state courts. [However], the analysis of these decisions is persuasive in the objective inquiry before the court.” Bauberger v. Haynes, 666 F.Supp.2d 558, 563 (M.D.N.C.2009) (internal citation omitted).