836 A.2d 884

**COMMONWEALTH of Pennsylvania, Appellee**

v.

**William STRONG, Appellant.**

Supreme Court of Pennsylvania.

Argued March 4, 2003.

Decided Nov. 25, 2003.

434

Suzanne M. Swan, Marjorie Alice Minkler, Victoria H. Vidt, Pittsburgh; M. Susan Ruffner, for William Strong, Appellant.

Michael Wayne Streily, Kevin Francis McCarthy, Pittsburgh, for the Com. of PA, Appellee.

Before: CAPPY, C.J., and CASTILLE, NIGRO, NEWMAN, SAYLOR, EAKIN and LAMB, JJ.

## OPINION

Justice EAKIN.

Jack Smith and three companions were in a car outside a bar. They testified appellant walked across the street toward them, pulled a pistol, beat Smith about the head, then shot him and another occupant; one of the occupants fired back. Appellant testified the first shots came from the car, and that when he ducked behind another car, a person called "Diddle" returned fire; he had no gun and did no shooting.

At trial, a detective was referred to a poster board diagram of the area of the shooting. The detective testified about eight shell casings and a cartridge found in the area; their locations were marked and numbered on the diagram. The diagram was used during the testimony and closing arguments, but

never offered or admitted into evidence. During deliberations, the jury asked to see the diagram again. Over appellant's objection, the court permitted a brief look at it, telling the jury:

> You asked to see the chart. I'm going to have [a member of my staff] bring the chart up with you. You take a good look at it. Each of you look it over. I'm not going to leave it in the jury room, because it may cause you to put too much emphasis on that one item. But you have all seen it. It's been shown to you many times. And both the defense and the prosecution have used it to argue to you. So I think it's fair that you take a good look at the chart and then, after you have done so, I will have [a member of my staff] bring it back down.

N.T., 8/2/00, at 286–87.

The jury convicted appellant of aggravated assault and four counts of recklessly endangering another person. On appeal, appellant asserted the trial court erred in allowing the deliberating jurors to view the diagram. The Superior Court found no reversible error, noting the broad use of the diagram during trial by all parties, the brief and temporary viewing during deliberations, and the value of the cautionary instructions given before that viewing.

This Court has not addressed whether the jury may review materials not marked as an exhibit or entered into evidence. In *Commonwealth v. Bango*, 454 Pa.Super. 339, 685 A.2d 564 (1996), *aff'd on other grounds*, 560 Pa. 84, 454 Pa.Super. 339, 742 A.2d 1070 (1999), the Superior Court considered whether transcripts of tapes, where the tapes had been admitted, could be considered by the jury. The Superior Court stated:

> The purpose of permitting the jury access to the transcripts was to make their deliberations more informed. With appropriate cautionary instructions, the jury's access to the spoken as well as the written word provided important guidance. We point out that the trial is the forum for finding truth. The jury's deliberations represent the process by which the fact finders establish what they believe to

be true. *For policy reasons, where materials inform a jury and aid it in the difficult task of determining facts, the jury should be permitted to study those materials during its deliberations.* In the instant case armed with proper cautionary instructions relating to the requirement that the tapes rather than the transcripts are to be considered valid, the jury could only benefit by the use of the transcripts as an aid in its assessment of the tapes. Because we find that access to the transcripts during deliberations was not [sic] court did not abuse its discretion in permitting such access. *Id.*, 685 A.2d at 566 (emphasis added). This Court granted review, but concluded the transcripts had been admitted into evidence; therefore, "the question of whether the trial court abused its discretion in permitting the jury to deliberate with items that have not been admitted into evidence [was] not before this Court." *Id.*, 742 A.2d at 1071 n. 5. The issue we did not address in *Bango* is now before us.

In *Commonwealth v. Engle*, 73 Pa.Super. 138, 1919 WL 2186 (1919), a witness was permitted to illustrate his description of a building floor by drawing a floor plan. Both the prosecution and defense used the diagram during their arguments, and the jury reviewed and passed the diagram around the jury box. During deliberations, the jury requested and received the diagram. The Superior Court, quoting from the trial court's opinion, held: "Standing by itself, it had of course no evidentiary value, but it was part and parcel of [the witness's] testimony and was as much in evidence as anything said by him." *Id.*, at *2.

Traditionally, diagrams have been used to illustrate or explain a witness's testimony without being placed into evidence. *See Geist v. Rapp*, 206 Pa. 411, 55 A. 1063, 1063 (1903) (model of scaffolding not in evidence may be used for illustration); *Hagan v. Carr*, 198 Pa. 606, 48 A. 688, 689 (1901) (freehand diagram may be used for illustration with caution from trial court and not regarded as evidence). Here, the diagram with the location of the casings helped explain the detective's testimony and the related pictures which were entered into evidence. To this extent, the diagram was no

longer merely illustrative, but was demonstrative and could have been offered as an exhibit. *See* Pa.R.E. 901(a) & Comments (demonstrative evidence such as diagrams must be authenticated), 402 (evidence must be relevant), and 403 (probative value not outweighed by danger of unfair prejudice).

While the policy reasons identified by the Superior Court in *Bango* to allow non-exhibits to go to the jury are persuasively stated, Pa.R.Crim.P. 646 [1] clearly states that only exhibits may go to the jury:

(A) Upon retiring, the jury may take with it such exhibits as the trial judge deems proper, except as provided in paragraph (B).

(B) During deliberations, the jury shall not be permitted to have:

    (1) a transcript of any trial testimony;

    (2) a copy of any written or otherwise recorded confession by the defendant;

    (3) a copy of the information;

    (4) written jury instructions.

Pa.R.Crim.P. 646.

■ There was an error, as the diagram was not offered as an exhibit, counsel for appellant was not asked or obliged to offer objections, and no ruling on admissibility was ever made. Appellant contends this violation of Rule 646 is prejudicial *per se,* requiring a new trial.

Although this Court has deemed some violations of this Rule to be prejudicial *per se,* other violations have been evaluated under the harmless error doctrine. *See Commonwealth v. Story,* 476 Pa. 391, 383 A.2d 155, 162 (1978). Under this doctrine, "an error may be harmless where the properly admitted evidence of guilt is so overwhelming and the prejudicial effect of the error is so insignificant by comparison that it is clear beyond a reasonable doubt that the error could not have contributed to the verdict." *Id.,* at 166.

1. Former Rule 1114.

438

In *Commonwealth v. Terry*, 501 Pa. 626, 462 A.2d 676 (1983), an inmate beat a guard to death and confessed to a police officer, who transcribed his statement. The officer testified he edited the confession before the inmate signed it, and may have omitted remarks he did not believe were relevant. The inmate's defense was that he suffered from delusions. During deliberations, the jury received the signed confession, which was explicitly prohibited by former Rule 1114. Citing the harmless error standard in *Story*, this Court granted a new trial, but only after determining the inmate was prejudiced because the confession omitted parts of his statement where he told the officer about his hallucinations.

In *Commonwealth v. Oleynik*, 524 Pa. 41, 568 A.2d 1238 (1990), the trial court sent written instructions regarding causation and definitions of third degree murder and involuntary manslaughter with the jury when it began deliberations. Although Rule 1114 did not explicitly prohibit this action, this Court noted the portion of the Rule which states "the jury may take with it such exhibits as the trial judge deems proper," was not applicable because the written instructions were not exhibits. *Id.*, at 1240 n. 2. Without specifically calling it a *Story* analysis, this Court concluded there was likelihood the jury would misinterpret or misapply the written instructions, and not seek further oral instructions from the trial court. The possible prejudice to the defendant from written instructions outweighed any benefit of such instructions, and a cautionary instruction by the trial court was "wholly inadequate to cure any possible prejudice." *Oleynik*, at 1241. A new trial was granted.

In *Commonwealth v. Karaffa*, 551 Pa. 173, 709 A.2d 887 (1998), the defendant was charged with a number of crimes, including two counts of rape and unlawful restraint. The trial court allowed the jurors to deliberate with written instructions on unlawful restraint and reasonable doubt. This Court reaffirmed *Oleynik* and concluded the potential adverse influence of the written instructions on the jury's deliberative process created a reasonable possibility the instructions received by the jury contributed to the verdict, citing *Story*. *Karaffa*, at

889. The error was reversible, rather than harmless, and a new trial was granted. Following *Karaffa,* Rule 1114 was amended to specifically prohibit the jury from receiving written jury instructions. *See* 29 Pa.B. 6102 (effective January 1, 2000).

■ *Terry*; *Oleynik,* and *Karaffa* demonstrate that a harmless error analysis will be applied to violations of this ilk, and that not every violation is *per se* prejudicial. The underlying reason for excluding certain items from the jury's deliberations is to prevent placing undue emphasis or credibility on the material, and de-emphasizing or discrediting other items not in the room with the jury. If there is a likelihood the importance of the evidence will be skewed, prejudice may be found; if not, there is no prejudice *per se* and the error is harmless.

Appellant contends the diagram misrepresented the detective's testimony on cross-examination, that he found one shell casing in the street and the remaining casings in front of the bar by a truck. He argues the diagram depicts casings strewn across the street, which is consistent with the victims' testimony and inconsistent with his version. This, he claims, prejudiced the jurors when they saw it again, and the error was not harmless.

The prosecution's testimony was that appellant fired at least one shot from the middle of the street before retreating toward the front of the bar. Appellant also puts himself in the middle of the street, although he denied firing at all; he stated he hit the ground, then ran toward the bar where he "stuck his head in" to call for his girlfriend. He testified a third party, "Diddle," did all the shooting at Smith and friends; no prosecution witness identified appellant as firing shots after the first one.

The testimony was that one casing was found in the street, others closer to the front of the bar and truck. The diagram showed some casings further into the street. Even if the diagram showed one casing in the middle of the road with the remaining strewn around the truck and bar, the single casing

indicates the shooter fired at least one shot from the middle of the road. The uncontroverted evidence proves that someone shot into the car, wounding two men; the only remaining question is the identity of the shooter and in this regard, one shot was enough to convict.

Appellant did not object to use of the diagram during the trial; in fact, appellant relied upon the diagram during cross-examination. While the dissent properly notes that the record does not always contain explicit statements by counsel when reference is being made to the diagram, a transcript cannot capture counsel's gestures, physical motions, nods and flourishes; that does not mean they did not occur. The trial court explicitly found "[d]efense counsel used the diagram during his cross-examination of the detective." Trial Court Opinion, 5/5/01, at 6. Appellant does not argue to the contrary, nor does he argue he relied on another diagram. There is no reason to disbelieve the word of the trial court that there was use of the diagram. Given this unchallenged finding, we must accept that appellant relied on the prosecution's diagram.

If the diagram was truly prejudicial to appellant, he should have made a timely motion and sought a truer representation; instead, he used it, and compellingly so. The jury viewed the diagram throughout the trial; it was not a surprise or mysterious depiction, but something used by all to aid their comprehension of the testimony. Further, the diagram was not left with the jury; it was brought in by court personnel for brief viewing, then removed. *See Commonwealth v. Morton*, 774 A.2d 750, 753 (Pa.Super.2001) (no violation of Rule 646 if, during deliberations, jury was placed in jury box, permitted to briefly review written confession, not permitted to deliberate while in jury box, and given cautionary instruction).

The prosecution's evidence identifying appellant firing the shot that hit the men is overwhelming. Three of the men identified appellant as the shooter, from a photo array; all of them testified he walked up to the car and pulled a pistol from his pants. Three of the men testified appellant pistol-whipped Smith, stepped back, then fumbled with the safety on the pistol. Two of them testified appellant shot into the car, and

one of the victims testified appellant shot Smith in the head and another man in the leg.

The diagram had little value in undermining the multiple eyewitness identifications that it was appellant who shot into the car. Accordingly, the error in letting the jury view the diagram was patently harmless.

Judgment of sentence affirmed.

Justice NIGRO files a dissenting opinion in which Justices CASTILLE and SAYLOR join.

Justice NIGRO dissenting.

Although I agree with the majority's conclusion that we should apply a harmless error analysis to the instant case, upon careful review of the record, I respectfully disagree that the trial court's error here was harmless.

Rule 646 of the Pennsylvania Rules of Criminal Procedure provides that:

(A) Upon retiring, the jury may take with it such exhibits as the trial judge deems proper, except as provided in paragraph (B).

(B) During deliberations, the jury shall not be permitted to have:

(1) a transcript of any trial testimony;

(2) a copy of any written or otherwise recorded confession by the defendant;

(3) a copy of the information;

(4) written jury instructions.

Pa.R.Crim.P. 646. Here, the trial court erroneously permitted the jury to deliberate with a diagram of the crime scene that purported to document the location of shell casings, even though that diagram was not a trial exhibit and thus, was not explicitly permitted under Rule 646(A). This Court has held that in certain circumstances, permitting a jury to deliberate with a non-exhibit is *per se* prejudicial, *see Commonwealth v. Karaffa*, 551 Pa. 173, 709 A.2d 887, 889–90 (1998) (delibera-

tions with written jury instructions is *per se* prejudicial), but I agree with the majority that deliberation with the diagram here should be analyzed under a harmless error standard, as the diagram was neither inherently prejudicial nor explicitly prohibited by Rule 646(B).[1] That said, I firmly disagree with the majority that the jury's deliberation with the diagram constituted harmless error, as the record makes clear that there was a reasonable possibility that the error contributed to the conviction. *See Commonwealth v. Johnson*, 828 A.2d 1009, 1012 n. 2 (Pa.2003).

The primary dispute in this case was over who fired shots at a car containing Jack Smith and three other persons. Throughout the trial, Appellant admitted that he was present at the shooting, but he consistently maintained that a man named "Diddle," who was Appellant's acquaintance, fired the shots. According to Appellant, he was at Frick and Frack's bar on the night of March 6, 1999, when Smith and three friends came into the bar, looking for "Derrick," who worked as a bartender there. N.T., 8/1/2000, at 192–93. Appellant testified that he and Smith got into an argument after he pointed out Derrick and told Smith that Derrick was "[his] boy."[2] *Id.* at 193. Following this confrontation, Appellant left the bar and walked down the street to "cool off," and as he did so, he saw Smith and his friends exit the bar and drive away in a Ford Explorer. *Id.* at 194–96. According to Appellant, he was walking back to the bar when he saw Smith turn the Explorer around, drive back to the bar and begin shooting towards him from across the street. *Id.* at 196. Appellant testified that he ducked behind a parked truck in

1. In this regard, I note that the use of the harmless error standard here aligns with federal case law. *See United States v. Santana*, 175 F.3d 57, 65 (1st Cir.1999) (harmless error standard applied where jury erroneously permitted to view defendant's ears during deliberation); *United States v. Kupau*, 781 F.2d 740, 744–45 (9th Cir.1986) (harmless error standard applied where jury erroneously permitted to deliberate with dictionary); *United States v. Hans*, 738 F.2d 88, 92 (3d. Cir.1984) (harmless error standard applied where jury erroneously permitted to view windbreaker allegedly worn by defendant during crime, even though windbreaker had not been admitted into evidence).

2. Appellant testified that Smith responded, "Oh you want some of this too?" and later threatened "I'll beat your a—." N.T., 8/1/2000, at 193.

front of the bar and witnessed Diddle, who was also outside in front of the bar, firing shots back at Smith. *Id.* at 196–97. Significantly for our purposes here, an eyewitness who lived above the bar, Joshua Crankshaw, confirmed Appellant's version of events by testifying that he saw Diddle fire multiple shots at the Explorer from behind the parked truck. *Id.* at 183.

In contrast, the Commonwealth presented evidence at trial that Jack Smith and three friends went to Frick and Frack's bar to confront the bartender who had been "saying some things about [Smith]," N.T., 7/31/2000, at 41, that Smith "did not appreciate." N.T., 7/28/2000, at 4. One occupant of the vehicle testified that after Smith finished "yelling obscenities" at the bartender, N.T., 7/31/2000, at 43, he and his three friends left the bar and drove away.[3] Shortly thereafter, however, they realized that they were heading in the wrong direction and therefore turned around and stopped across the street from Frick and Frack's bar to permit Smith to change the compact discs in the Explorer's compact disc player. N.T, 7/31/2000, at 44–45; N.T., 7/28/2000, at 53. According to the Commonwealth's evidence, Appellant pulled up in a car behind Smith and his friend, walked up to the Explorer's driver's side window, beat Smith in the head with a gun, then fired multiple shots into the vehicle at close range, in one instance "la[ying] the pistol on [Smith's] head" before shooting. N.T., 7/31/2000, at 48–50, 83; *see also* N.T., 7/28/2000, at 80–81, 136–37.

As these two versions of events differed not only as to the identity of the shooter, but also as to the location from which the shots at issue were fired, the location of shell casings recovered from the crime scene became extremely important in determining which version of events was correct. In that regard, a detective testified that police recovered a total of eleven shell casings and one live round from the scene. Three of the casings were recovered from inside of the Explorer, N.T., 7/31/2000, at 101–02, 110, and were subsequently deter-

**3.** Smith himself also admitted at trial that he approached the bartender, said "I'm here now. Talk s—— now," took off his jacket and proceeded to curse and use a lot of obscenities. N.T., 7/28/2000, at 48.

mined to have been fired from the gun of another occupant of the Explorer, Charles Vincent. Of the eight remaining shell casings, the detective testified that only one was found in the middle of the street, near where Smith's vehicle was stopped. *Id.* at 110, 130. In fact, the detective testified that the other seven shell casings were found on the sidewalk in and around the truck that had been parked in front of the bar,[4] *id.* at 130, and the sole live round was on the sidewalk in front of Frick and Frack's bar, *id.* at 111, all of which is entirely consistent with Appellant's version of events that Diddle shot at the Explorer from behind that truck and inconsistent with the Commonwealth's version of events that Appellant approached the vehicle from behind and shot into the vehicle from the driver's side window, at close range.[5]

During the detective's direct testimony, however, the Commonwealth used as a visual aid a hand-drawn, not-to-scale diagram of the crime scene, and either the prosecutor or the detective made notations on the diagram to indicate where the detective had supposedly found the shell casings and live round.[6] In stark contrast to the detective's testimony, the notations on the diagram showed four shell casings in the middle of the street, near the Explorer, essentially where the Commonwealth asserted that Appellant had been standing when he shot at Smith.

Under these circumstances, I can only conclude that there was a reasonable possibility that permitting the jury to deliberate with this diagram, which was not an exhibit and did not conform to the evidence at trial, contributed to Appellant's conviction. In fact, while it is impossible to determine exactly

4. The parties stipulated that two casings were found in the bed of the truck. N.T., 8/1/200, at 163.

5. As the detective himself testified, casings are typically found in close proximity to where a gun is fired, *see* N.T., 7/31/2000, at 129, and therefore one would have expected police to find more than one casing in the middle of the street if Appellant had fired several shots there, as the occupants of the Explorer asserted.

6. Although it is clear that the prosecutor himself drew the diagram, there is some disagreement as to whether the prosecutor or the detective inserted the notations indicating the location of the shell casings.

what weight the jury put on the diagram, it appears from the circumstances under which the verdict was rendered that the jury gave the diagram at least some weight. In that regard, on the second day of deliberations, the jury sent a note to the trial judge, indicating that they were unable to reach a verdict, *see* N.T., 8/2/2000, at 287 ("If we have not come close to a unanimous verdict by the end of today what would be your ruling[?]"), and at the same time, requesting that it be permitted to see the diagram. Although the trial judge expressed concern that the jury would mistakenly believe that the diagram was an accurate rendition of the location of the shell casings,[7] he nevertheless permitted the jury to view it for a short time. Later that day, the jury reached a unanimous verdict. This series of events, while not conclusive on the issue of harmless error, certainly reinforces my conclusion that there is reasonable doubt as to whether the viewing of the diagram was truly harmless.

The majority, on the other hand, concludes that the error was "patently harmless," Majority op. at 441, 836 A.2d at 889, finding that the evidence identifying Appellant as the shooter was "overwhelming" essentially because three of the occupants of Smith's Explorer identified Appellant as the shooter. *Id.* However, in concluding as such, the majority completely ignores the significant evidence that supported Appellant's version of events. Not only did Appellant call the credibility of the Commonwealth's witnesses into question with probing cross-examination,[8] but, as stated above, the testimony of the only arguably neutral eyewitness, Joshua Crankshaw, supported Appellant's assertion that Diddle was the shooter. Moreover, the testimony of defense witnesses regarding Appellant's confrontation with Smith provided a basis on which

7. N.T., 8/2/2000, at 281 ("The Court: [The jury] is going to be inclined to think that the diagram is accurate, otherwise they wouldn't be asking for it.").

8. Among other things, defense counsel effectively questioned the occupants of the car as to how they could have "mistakenly" driven in the wrong direction when they left the bar, and why they chose to stop immediately in front of the bar to change CDs when they had just left that very location because trouble was brewing. *See, e.g.,* N.T., 7/28/2000, 51–55.

the jury could have found that Smith and his friends were motivated by revenge in identifying Appellant as the shooter. And finally, as emphasized above, the testimony of the detective regarding the shell casings supported Appellant's assertion that Diddle shot at the Explorer car from behind the truck parked in front of the bar. Thus, contrary to the majority's conclusion, there was more than sufficient evidence from which a jury could have concluded that Appellant was not, in fact, the shooter.

In supporting its holding that the error was harmless, the majority also appears to find relevant that Appellant did not object to the use of the diagram during the trial and purportedly relied upon the diagram on cross-examination. Majority op. at 440, 836 A.2d at 888. Unlike the majority, however, I see no evidence in the record that Appellant's counsel referred to the diagram at trial, much less relied upon it.[9] In any event, it is clear that Appellant never relied on the diagram for the purpose of showing the location of the shell casings, which he has consistently contested. Moreover, in my view, the fact that Appellant did not object to the diagram during the course of the detective's testimony is simply irrelevant, as the diagram was merely a visual aid and the Commonwealth never attempted to admit it into evidence. Significantly, Appellant did timely object to the trial court's decision to permit the jury to view the diagram during deliberations.

Finally, the majority finds support for its position that the error was harmless in the fact that the diagram was "not left with the jury," but rather "was brought in by court personnel for brief viewing, then removed." Majority op. at 440, 836 A.2d at 889. However, I take little solace in the fact that the viewing of the diagram was "brief" when the jury really only needed enough time to view what amounted to a simple picture on a single page. Moreover, I note that the single case on which the majority relies in finding the length of the

9. Appellant's counsel did refer to a *different* diagram, a chalk drawing of Smith's vehicle, when posing a hypothetical question to the Commonwealth's expert regarding why no bullets were found inside of Smith's vehicle. *See* N.T., 8/1/2000, at 177.

viewing to be relevant, *Commonwealth v. Morton*, 774 A.2d 750, 753 (Pa.Super.2001), is clearly distinguishable as the court in that case put significant emphasis on the fact that the jury was only permitted to view the material at issue while sitting in the jury box and unlike the jury here, was not permitted to deliberate while reviewing it.

Under these circumstances, I am unconvinced by the majority's rationale for finding the trial court's error to be harmless. As explained above, the location of the shell casings was an important piece of physical evidence that provided critical support for Appellant's defense in this case. That the trial court nevertheless permitted the jury, during deliberations, to view a diagram that contradicted the evidence on this point and itself was never admitted into evidence, surely had the potential to be highly prejudicial. Accordingly, unlike the majority, I would find that there is a reasonable possibility that the error contributed to the conviction and would therefore grant Appellant a new trial.

Justices CASTILLE and SAYLOR join this dissenting opinion.