J-S48003-16

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| COMMONWEALTH OF PENNSYLVANIA | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| Appellee | |
| v. | |
| DEMETRIUS D. GIBSON | |
| Appellant | No. 590 WDA 2015 |

Appeal from the Judgment of Sentence January 15, 2015
In the Court of Common Pleas of Cambria County
Criminal Division at No(s): CP-11-CR-0001873-2013

BEFORE:  BOWES, DUBOW AND MUSMANNO, JJ.

MEMORANDUM BY BOWES, J:                    **FILED AUGUST 25, 2016**

Demetrius Gibson appeals from the aggregate judgment of sentence of sixteen to forty years of incarceration following his conviction for, *inter alia*, third-degree murder.  We affirm.

The trial court summarized the factual history of this case in its Pa.R.A.P. 1925(a) opinion.

> The testimony and evidence presented at trial revealed that [Appellant] was involved in a relationship with Elizabeth [Miller] that was marred by incidents of mutual domestic violence.  On the evening of August 5, 2013, [Appellant] and Elizabeth were at their residence at 1157 Catherine Street, Apartment 7 in Tire Hill, with Elizabeth's brother Quinn Miller (Quinn).  Around midnight Quinn heard Elizabeth screaming and upon going to the upstairs bedroom he found that [Appellant] had Elizabeth on a bed and was choking her.  Quinn intervened at which time [Appellant] threatened both Elizabeth and Quinn with a hammer he picked up from beside the bed.  While holding the hammer [Appellant] asked Quinn if he wanted to die.  Following this

incident Elizabeth and [Appellant] began a series of verbal and physical assaults on one another ending up downstairs. At some point during this altercation [Appellant] obtained a kitchen knife and threatened Elizabeth and Quinn with it again asking Quinn if he wanted to die.

Eventually Elizabeth and Quinn left the apartment and started driving around in her car intending to return to the house Quinn shared with other family members. Elizabeth discovered that she left her cell phone in the apartment and called [Appellant] using Quinn's cell phone several times to arrange to get her phone back. She agree[d] to meet [Appellant] at a car wash in the Moxham section of Johnstown to return her phone. Elizabeth and Quinn arrived at the car wash first around 4:30 a.m. and [Appellant] arrived shortly after in his red Chevrolet Blazer and parked in one of the car wash stalls. Elizabeth exited her car and got into the front passenger seat of [Appellant]'s car where she remained for sometime. Elizabeth and [Appellant] eventually began arguing loudly and Quinn exited Elizabeth's car and walk[ed] towards the Blazer to see if his sister was all right.

Quinn observed [Appellant] and Elizabeth arguing and fighting in the vehicle. Elizabeth told Quinn that [Appellant] had a knife and [Appellant] admitted to Quinn that he did. Quinn walked to the passenger side of the Blazer and tried to pull Elizabeth from the vehicle while she was fighting with [Appellant]. While engaged in this effort Quinn saw a large knife in [Appellant]'s hand and saw [Appellant] stab Elizabeth in the back. [Appellant] then threw the knife out the driver's side window. As [Appellant] drove off Elizabeth partially fell and was partially pulled by Quinn out of the Blazer.
. . .

Police and emergency personal arrived and Elizabeth was transported to Conemaugh Memorial Hospital. Elizabeth suffered massive blood loss due to the knife puncturing her inferior vena cava. She died as a result of her wounds at the hospital as doctors attempted to stop the bleeding.
. . .

Efforts to locate [Appellant] continued for ten days and involved both state and federal authorities. [Appellant] eventually turned himself in to Johnstown Police. The knife and other evidence

w[ere] recovered from the crime scene with additional evidence being recovered after searches of the Blazer and apartment were conducted after search warrants had been obtained. Elizabeth's cell phone was eventually recovered from the apartment. [Appellant] did not testify but argued, *inter alia*, that Quinn, the only eyewitness, did not see the entire incident that occurred inside the Blazer, that it was Elizabeth who was the initial aggressor with the knife, and that [Appellant] was acting in self - defense when they struggled. [Appellant] argued he had taken the knife from Elizabeth and that the stabbing was accidental and resulted when Elizabeth fell backwards into the Blazer when Quinn was trying to pull her out of the vehicle which resulted in her falling onto the knife and impaling herself. By nature of the verdicts the jury rejected [Appellant]'s theory and found Quinn's testimony credible as the only eyewitness to these events.

Trial Court Opinion, 8/11/15, at 4-7.

On September 3, 2014, the jury found Appellant guilty of third-degree murder, as well as aggravated assault, aggravated assault with a deadly weapon, and recklessly endangering another person.[1] The trial judge imposed the aforementioned sentence on January 15, 2015.

Appellant filed timely post-sentence motions, which were denied. A notice of appeal was perfected, followed by a timely Pa.R.A.P. 1925(b) statement that raised twelve issues. The trial court issued its opinion in response and the matter is now ready for our review. Appellant raises three issues.

_____

[1] Appellant was also alleged to have attempted to run over a civilian when he briefly returned to the scene in his vehicle. He was found not guilty of aggravated assault as to that bystander.

1. Whether the trial court erred in denying the motion to suppress the warrantless seizure of a motor vehicle, which was not mobile, and evidence derived from the seizure and the fruits thereof, inasmuch as the Commonwealth failed to prove any exigency or other justification for such warrantless seizure?

2. Whether the trial court abused its discretion in denying the motion for new trial asserting that the verdicts were against the weight of the evidence, being manifestly unreasonable in light of countervailing evidence from the Commonwealth's experts?

3. Whether the trial court abused its discretion in permitting an exhibit, a DNA report, about which an expert had testified, to go to the jury during their deliberations, which was over defense objection, inasmuch as the report was prejudicial, subject to misinterpretation, cumulative and unnecessary due to the expert's testimony, and contained matters outside of the testimony?

Appellant's brief at 6.

Appellant first asserts that the trial court should have suppressed all evidence recovered from the vehicle. The search, conducted pursuant to a warrant, is alleged to be the fruit of an unreasonable warrantless seizure. When reviewing the denial of a suppression motion, we are subject to the following standard of review:

[An appellate court's] standard of review in addressing a challenge to the denial of a suppression motion is limited to determining whether the suppression court's factual findings are supported by the record and whether the legal conclusions drawn from those facts are correct. Because the Commonwealth prevailed before the suppression court, we may consider only the evidence of the Commonwealth and so much of the evidence for the defense as remains uncontradicted when read in the context of the record as a whole.

*Commonwealth v. Jones*, 121 A.3d 524, 526 (Pa.Super. 2015) (citation omitted).

The facts pertinent to the seizure are as follows. Detective Larry Wagner of the City of Johnstown Police testified that, based on information from Mr. Miller and other eyewitnesses, he obtained a list of vehicles registered to Appellant. N.T. Suppression, 5/6/14, at 12. A "be on the lookout" was sent via dispatch. Subsequently, a homeowner called police to report a vehicle was blocking his driveway. *Id*. at 12-13. Sergeant Thomas Owens responded to the scene and observed the vehicle in question, which was stuck due to its back end hanging over an embankment. *Id*. at 52. The vehicle was blocking part of the street as well as the driveway. *Id*. at 53. The officer observed blood on the passenger seat. Believing the vehicle to be the same one involved in the murder, Sergeant Owens had the vehicle towed to a facility. *Id*. The trial court upheld the seizure as valid due to probable cause and exigent circumstances, in that Appellant, who was not yet in custody, could return to the scene and have the vehicle removed. Trial Court Opinion, 8/11/15, at 9. The trial court also stated the Blazer was abandoned and blocking the roadway, thus permitting officers to remove it pursuant to 75 Pa.C.S. § 3352 (unattended vehicle obstructing roadway or posing safety hazard may be moved).

According to Appellant, the police either needed a warrant, or probable cause and exigent circumstances, to seize the vehicle, "[S]ince the evidence

showed that [the Blazer] was stuck, negating its inherent mobility, which obviated the motor vehicle exception to the warrant requirement, as that exception was announced in *Commonwealth v. Gary*, 91 A.3d 102 (Pa. 2014)." Appellant's brief at 14. *Gary*, decided after the search in question, expanded, rather than limited, the ability of police to search vehicles without a warrant by adopting the federal automobile exception to the warrant requirement.[2] Thus, Article I, Section 8 of the Pennsylvania Constitution affords no greater protection than its Fourth Amendment to the United States Constitution counterpart. "The prerequisite for a warrantless search of a motor vehicle is probable cause to search; no exigency beyond the inherent mobility of a motor vehicle is required." *Id*. at 138. Appellant states that since the vehicle in question was immobile, the rule announced in *Gary* does not apply and the police needed a warrant to seize the vehicle.

Appellant's argument is misplaced for two reasons. First, Appellant fails to recognize the source of police authority to seize the vehicle in question. Vehicle seizure questions normally arise in the context of traffic stops, for which there must be, depending on the offense at issue, either reasonable suspicion or probable cause to effectuate a stop.

_____

[2] The lead opinion is a plurality of three Justices. Now-Chief Justice Saylor "join[ed] the lead Justices in adopting the federal automobile exception." *Id*. at 138. Thus, *Gary* is precedential.

*Commonwealth v. Chase*, 960 A.2d 108, 111 (Pa. 2008).  Here, however, the seized vehicle was disabled and abandoned.  Police authority to seize such vehicles without a warrant has been described as "beyond challenge."

> In the interests of public safety and as part of what the Court has called "community caretaking functions," *Cady v. Dombrowski*, *supra*, 413 U.S. at 441, 93 S.Ct. at 2528, automobiles are frequently taken into police custody. Vehicle accidents present one such occasion. To permit the uninterrupted flow of traffic and in some circumstances to preserve evidence, disabled or damaged vehicles will often be removed from the highways or streets at the behest of police engaged solely in caretaking and traffic-control activities. Police will also frequently remove and impound automobiles which violate parking ordinances and which thereby jeopardize both the public safety and the efficient movement of vehicular traffic. The authority of police to seize and remove from the streets vehicles impeding traffic or threatening public safety and convenience is beyond challenge.

*South Dakota v. Opperman*, 428 U.S. 364, 368–69, (1976) (footnote omitted); *Accord Commonwealth v. Hennigan*, 753 A.2d 245, 255 (Pa.Super. 2000) (recognizing the "community caretaking function" doctrine).  Here, Appellant's vehicle was jeopardizing public safety and convenience by blocking a citizen's driveway.  The police were therefore permitted to seize and tow the vehicle without prior judicial approval.

Furthermore, we note that Appellant misapprehends *Gary*, which clearly adopted a bright-line rule.  *Gary* extensively traced the development of the federal automobile exception, and, in so doing, cited several federal cases which directly contradict Appellant's claim that a vehicle's mobility is material to application of the automobile exception.  Under *Gary*, the police

would have been permitted to both seize and search the vehicle upon a finding of probable cause, regardless of the vehicle's mobility.

> It is thus clear that the justification to conduct such a warrantless search does not vanish once the car has been immobilized; nor does it depend upon a reviewing court's assessment of the likelihood in each particular case that the car would have been driven away, or that its contents would have been tampered with, during the period required for the police to obtain a warrant.

*Gary*, *supra* at 110 (quoting *Michigan v. Thomas*, 458 U.S. 259 (1982) (*per curiam*)). Two years later, the High Court reiterated that whether the vehicle is effectively immobile is irrelevant to the automobile exception. *Florida v. Meyers*, 466 U.S. 380 (1984). *Gary* adopted the federal standard and its corresponding body of case law. Thus, under *Gary*, the mobility of the vehicle is irrelevant. We agree with the trial court that there was probable cause to justify seizing the vehicle, given that it matched the description of a vehicle driven by a wanted homicide suspect and contained blood. Thus, a warrantless search would have been permitted.[3] No relief is due.

---

[3] Appellant implicitly concedes, by citing to *Gary,* that its rule would apply to the search herein. In *Commonwealth v. Hudson*, 106 A.3d 724 (Pa.Super. 2014), we assumed, without deciding, that the rule of *Gary* would apply on direct appeal to a search, such as the one here, conducted before it was announced. The trial court did not rely on *Gary*, and we simply note here in passing that its application would be less favorable, not more, to Appellant's position.

Appellant's second appellate claim attacks the weight of the evidence supporting his convictions. He posits that the evidence "shows that the fatal wound resulted from misadventure, and the guilty verdicts shocked the sense of justice." Appellant's brief at 17. Our Supreme Court has defined homicide by misadventure as follows: "Homicide by misadventure, which is excusable, is defined as: the accidental killing of another, where the slayer is doing a lawful act, unaccompanied by any criminally careless or reckless conduct." *Commonwealth v. Charleston*, 94 A.3d 1012, 1025 (Pa.Super. 2014) (citations omitted).

Appellant's basis for a new trial on these grounds relies on the testimony of two Commonwealth expert witnesses: Amy Irwin, a DNA expert, and Dr. Heggere, the pathologist who conducted the autopsy. The witnesses respectively testified that Appellant's DNA was not present on the knife and that the victim had no visible injuries.

> Given the testimony of the two experts, Amy Irwin and Dr. Heggere, which discredited [Mr. Miller]'s version of the struggle leading to the fatal stab wound and established a basis for misadventure leading to that wound, the trial court's exercise of discretion in denying the motion for new trial based on the weight of the evidence was manifestly unreasonable.

Appellant's brief at 19 (citation and quotation marks omitted).

Our review of a weight claim reviews the exercise of the trial court's discretion, not the underlying question of whether the verdict is against the weight of the evidence. *Commonwealth v. Leatherby,* 116 A.3d 73, 82

(Pa.Super.2015) (citing **Commonwealth v. Brown**, 23 A.3d 544, 558 (Pa.Super. 2011)). "One of the least assailable reasons for granting or denying a new trial is the lower court's conviction that the verdict was or was not against the weight of the evidence and that a new trial should be granted in the interest of justice." **Id.** at 82.

Herein, the trial court, in rejecting Appellant's post-trial motion for a new trial, reviewed the evidence supporting the verdicts and determined that the verdict was not against the weight of the evidence:

> There was only a single eyewitness to the fatal encounter and the jury was free to credit his testimony or not as they saw fit. . . . The nature of the verdict is such that the jury obviously gave credit to Quinn's testimony and there was nothing that occurred during trial to give this jurist cause to question that decision by the fact finder.

Trial Court Opinion, 8/11/15, at 34. We discern no abuse of discretion on the trial court's part in reaching this conclusion. The sole eyewitness testified unequivocally that Appellant deliberately stabbed the victim in her back. The record amply supports the court's conclusion that the guilty verdicts were not so contrary as to shock its sense of justice. Since the jury was free to believe none, all, or part of the evidence presented, it could reject Mr. Miller's testimony about choking or striking while crediting the testimony that he saw Appellant stabbing Ms. Miller, or simply find that the testified-to blows would leave no visible injuries. Similarly, the lack of

Appellant's DNA on the knife does not compel a different result.[4]  The trial

judge determined that the facts testified to by the expert witnesses were not

deserving of greater weight than the facts set forth by Mr. Miller.  The record

supports the court's conclusion and we find no abuse of discretion.

Appellant's third assignment of error assails the trial court's decision to

permit the jury access to an expert report during deliberations.  Pa.R.Crim.P.

646 sets forth the materials a jury may possess, and grants the trial judge

the leeway to provide "such exhibits as the trial judge deems proper,"

excepting the following items.

> (C) During deliberations, the jury shall not be permitted to have:
>
> > (1) a transcript of any trial testimony;
> > (2) a copy of any written or otherwise recorded confession by the defendant;
> > (3) a copy of the information or indictment; and
> > (4) except as provided in paragraph (B), written jury instructions.

Pa.R.Crim.P. 646(C).    Since  the  report  in  question  is  not  specifically

prohibited by rule, we apply an abuse of discretion standard.  "Whether an

exhibit should be allowed to go out with the jury during its deliberation is

within the sound discretion of the trial judge."  ***Commonwealth v. Barnett***,

---

[4]  Appellant's weight-of-the-evidence argument regarding the lack of DNA on the knife is in effect a sufficiency claim.  Logically, we can conclude that the verdict shocks the conscience only if we find the lack of DNA requires a finding that Appellant did not commit the crime of third-degree homicide.

50 A.3d 176, 194 (Pa.Super. 2012) (quoting **Commonwealth v. Merbah**, 411 A.2d 244, 247 (Pa.Super. 1979)).

The exhibit in question was submitted at trial through Amy Irwin, the aforementioned Commonwealth expert, who testified that she examined several items to determine whether the victim's DNA, Appellant's DNA, or both, was present. N.T. Volume IV, 8/29/14, at 83. Pertinent to the claim on appeal, Ms. Irwin testified that the blood on the knife blade matched only Ms. Miller's DNA. *Id*. at 93. The handle of the knife, described as a black cord wrapped around the weapon, also contained the victim's DNA. *Id*. at 97-98. Ms. Irwin stated that tests for the presence of Y chromosome yielded no interpretable results since there was an insufficient amount of male DNA on the handle. *Id*. at 98. The trial court admitted, without objection, her expert report. *Id*. at 99. The exhibit was not published to the jury.

During closing argument, Appellant's attorney repeatedly noted that the victim's DNA is on the knife, while Appellant's DNA was not. N.T. Volume VII, 9/3/14, at 74 ("If you were accused of holding an instrument, and your defense is that you didn't hold it, what are you going to do, come up and say, I didn't hold it. . . . I got better, the science says he didn't touch it."); *Id*. at 80 ("First of all, her DNA is on it. . . . Why isn't his DNA on the knife?"); *Id*. at 91 ("Can you say that [Appellant] held that knife when his DNA isn't on it, just because of Quinn[?]).

- 12 -

The jury thereafter submitted a question reading, "Lab report DNA on knife. Defines touch. Skin cells? Sweat?" Court's Exhibit A (some punctuation added). The trial judge, over Appellant's objection, permitted the jury to receive the DNA report.

The following principles guide our review in determining whether the trial court abused its discretion. In **Commonwealth v. Strong**, 836 A.2d 884 (Pa. 2003), our Supreme Court addressed whether the trial court erred in permitting the jury, during its deliberations, to look at a crime scene diagram which was used by the parties during trial but never offered or admitted into evidence. **Id**. at 885. **Strong** noted that Rule 646 applies only to exhibits, and, since the judge therein sent an item that was not moved into evidence, the diagram was not within the purview of the rule. **Strong** therefore had to determine whether such errors were subject to harmless error analysis or were *per se* prejudicial. **Id**. at 888. In concluding harmless error applied, the Court observed the following:

> The underlying reason for excluding certain items from the jury's deliberations is to prevent placing undue emphasis or credibility on the material, and de-emphasizing or discrediting other items not in the room with the jury. If there is a likelihood the importance of the evidence will be skewed, prejudice may be found; if not, there is no prejudice *per se* and the error is harmless.

**Id**. at 888. Thus, the likelihood that the importance of the evidence would be skewed was part of the harmless error analysis, not a consideration to be

made in determining whether the trial court abused its discretion under Rule 646.

In **Commonwealth v. Woodard**, 129 A.3d 480 (Pa. 2015), our Supreme Court analyzed whether a judge erred in permitting the jury to review, during its deliberations, expert reports drafted by experts for both the prosecution and the defense that were admitted into evidence. **Id**. at 495. The Court incorporated the above-quoted rationale into the abuse of discretion analysis:

> We hold that Appellant has failed to demonstrate an abuse of discretion. . . . Relating to the medical expert reports, we find that they are not specifically precluded from examination during deliberations pursuant to Rule 646(C) and that it is unlikely that the jury would be skewed by placing undue emphasis on one report over the other, considering that the expert medical reports from both the prosecution and the defense were permitted in the jury room. Because no prejudice arose from the jury's examination of the expert reports, Appellant is not entitled to relief.

**Id**. at 497 (citing **Strong**). Thus, **Woodard** adopted the harmless error considerations of **Strong**, *i.e.*, whether the material will skew the effect of the evidence in some fashion, in deciding whether the trial court abused its discretion in permitting the jury to review the material. Since **Woodard** found no abuse of discretion while also noting a lack of prejudice, we view the inquiries as overlapping.

In assessing whether a new trial is warranted, we must consider whether the prejudicial effect of the evidence was severe and readily

apparent. *Barnett*, *supra* at 194. We have noted that a failure to object to the admission of the evidence and a jury request to view the exhibit are both factors militating against a finding of prejudice. *Id*. at 195 (citing cases). Finally, we are mindful that the comment to the rule cites *Commonwealth v. Pitts*, 301 A.2d 646, 650 n. 1 (Pa. 1973). *Pitts*, a case decided under the predecessor to Rule 646, found no abuse of discretion in granting the jury access to a fingerprint chart into the jury room. *Pitts* observed in *dicta* that "it would be a better procedure not to allow exhibits into the jury room which require expert interpretation." *Id*.

With the foregoing precepts in mind, we now turn to Appellant's substantive complaint. He argues that the report skewed the importance of Ms. Irwin's testimony in that the DNA report as submitted "show[s] not only loci and letters and numbers galore to which the expert did not testify, but also that the matters on which she did testify and opine could not readily be related to the jury's question[.]" Appellant's brief at 21. Appellant avers the report served to undermine Ms. Irwin's testimony and opinion, since a proper examination of the DNA report required interpretation.

We have reviewed the report and find that Appellant has failed to demonstrate a likelihood that the jury placed undue emphasis on the document. We agree that the report contains several instances of highly-technical information not testified to by the expert, and understanding those matters required expert testimony.

- 15 -

However, the highly-technical nature of the report demonstrates that no error occurred. The jury's question pertained to the knife, and the report states in plain English that Elizabeth Miller's blood was on the knife's handle. The complained-of additional information in the report, such as the different genetic loci tested, is not readily understandable and sheds no light on the case without expert interpretation. We thus reject Appellant's claim that the report skewed the importance of Ms. Irwin's testimony. If anything, the inability to understand the exhibit emphasized the importance of the expert's testimony. Ms. Irwin clearly testified that Appellant's DNA was not on the knife handle, and the jury was well aware of this fact due to the repeated references during closing argument. This is not a situation where competing experts offered differing interpretations or opinions, nor does the report contain any opinion or speculation regarding why Appellant's DNA did not appear on the handle. While we think the better course would have been to instruct the jury to rely on the testimony of the expert, we find no prejudice from the jury's examination of the report and Appellant is not entitled to relief.

Judgment of sentence affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date:  8/25/2016